462 So.2d 1 (1984)
AMERICAN MEDICAL INTERNATIONAL, INC., Palm Beach Gardens Community Hospital, Inc., and T.R. Bruce, Jr., Appellants/Cross Appellees,
v.
Zbigniew SCHELLER, Appellee/Cross Appellant.
No. 80-1650.
District Court of Appeal of Florida, Fourth District.
July 13, 1984.
Rehearing Denied January 30, 1985.
*2 Mark Hicks of Daniels & Hicks, Mercer K. Clarke of Smathers & Thompson, Miami, and Larry A. Klein, West Palm Beach, for appellants/cross appellees.
Edna L. Caruso of Edna L. Caruso, P.A. and Montgomery, Lytal, Reiter, Denney & Searcy, P.A., West Palm Beach, for appellee/cross appellant.
BERANEK, Judge.
This is an appeal and cross appeal growing out of a complex intra-hospital battle between the corporation owning the hospital and at least some of the medical staff. Dr. Scheller, a pathologist previously under contract with the hospital as laboratory director, brought a suit which resulted in a substantial jury award. The defendants in the action were: Palm Beach Gardens Community Hospital, Inc.; American Medical International, Inc.; Mr. T.R. Bruce; and Dr. Hobin. The jury awarded Dr. Scheller $1,250,000 in compensatory damages under three theories as set forth in different counts. The theories of liability were: (1) breach of contract, (2) tortious interference with a contractual relationship, and (3) tortious interference with an advantageous *3 business relationship. This amount ($1,250,000) was awarded against Palm Beach Gardens Community Hospital, American Medical International, Inc., and Mr. Bruce. The parties stipulated that the jury could return a verdict for one amount on all three counts against all defendants. Under this stipulation as to the verdict, there is no break down as to how much the jury would have awarded for each count against the separate defendants. The jury also awarded Dr. Scheller punitive damages in the following amounts: (1) American Medical International  $4,000,000; (2) Palm Beach Gardens Community Hospital, Inc.  $1,000,000; and (3) Mr. T.R. Bruce, Jr.  $1,000,000. Thus, the total amount awarded Dr. Scheller was $7,250,000, or $1,250,000 in compensatory damages, and $6,000,000 in punitive damages. On post-trial motions, the trial court vacated the punitive damages award against Mr. Bruce and granted him a new trial.
The defendants have appealed and plaintiff has cross appealed. The theories of liability and the underlying facts are complex. Extensive pretrial pleadings and discovery and a three-week jury trial resulted in an appellate record of over 7,200 pages. Complimentary to the trial judge, no error is asserted as to any evidentiary rulings, jury instructions, or the form of verdict.[1] A summary of the facts follows.

*4 Dr. Scheller  the plaintiff, a hospital pathologist who sued for breach of his employment contract and for tortious interference with contractual and business relationships. Although no longer director of the pathology lab, the doctor remained on the hospital staff.
Palm Beach Gardens Community Hospital, Inc. (hospital)  the defendant/hospital where Dr. Scheller was (and is) on the medical staff.
T.R. Bruce, Jr.  a defendant, the hospital's full-time administrator.

*5 Dr. Hobin  a defendant, the pathologist hired to replace Dr. Scheller. This physician was not on staff for two years before being hired but was employed earlier by the hospital.
American Medical International, Inc.  the parent corporation and 100% stockholder of the hospital. (AMI).
In 1970, the AMI Corporation purchased the hospital. The AMI corporation owns numerous health care facilities, and the corporation and the hospital are both in business for profit. On May 12, 1975, Dr. Scheller, a pathologist, signed an employment contract as laboratory director with the hospital effective July 18, 1975. Dr. Scheller was already a member of the medical staff of the hospital before he signed this contract as laboratory director. A great deal of controversy occurred regarding the operation of the pathology lab both before and after Dr. Scheller took over. Mr. T.R. Bruce, Jr., was the full-time administrator of the hospital, and on May 29, 1979, he sent Dr. Scheller a letter termination the doctor's employment contract effective as of September 1, 1979. This termination is not asserted as a breach of contract nor does Dr. Scheller contend it to be otherwise improper. However, on May 31, 1979, the hospital hired Dr. Hobin to replace Dr. Scheller as the hospital pathologist. It was the hiring of Dr. Hobin which is asserted to be a breach of contract and to have otherwise contravened Dr. Scheller's rights. On August 21, 1979, Dr. Scheller filed the suit involved in this appeal. Dr. Scheller was still on the medical staff of the hospital at the time and is still so employed with full privileges in clinical and anatomical pathology. Although Dr. Scheller was no longer director of the laboratory, he was chosen and designated by numerous doctors on the medical staff of the hospital as their own special medical expert in the pathology.[2] During the course of Dr. Scheller's continued practice in the hospital and while the lawsuit was pending he secured at least two injunctions against the hospital. The hospital had barred the doctor from certain internal records and from certain aspects of the laboratory. The injunctions required the hospital to give Dr. Scheller full access to the laboratory and the records. In May, 1980, the trial in the instant case occurred.
The defendants raise four points on appeal. Point I relates to the breach of contract theory while Points II and III concern tortious interference with a contract and an advantageous business relationship. Point IV addresses damages. The plaintiff's cross appeal contests the new trial granted to defendant Bruce.
The breach of contract theory is attacked as a matter of law in defendants' first argument which urges error in the court's denial of motions for directed verdict. The theory of liability and the attack thereon require reference to the employment contract and the by-laws of the medical staff. Dr. Scheller's employment contract contained 19 clauses. The last clause dealt with termination of the contract and provided as follows:
The term of this Agreement shall be for a period of three (3) years ... and continuing from year to year thereafter unless terminated as herein provided, provided, however, that either of the parties hereto shall have the right and privilege of cancelling and terminating this Agreement upon ninety (90) days written notice to the other. Upon the expiration of said notice, this Agreement shall be and become of no further force or effect whatsoever and each of the parties hereto shall be relieved and discharged herefrom. (Emphasis supplied.)
Based on Clause Nineteen, which both parties agree is unambiguous, defendants assert the contract was terminable without cause upon ninety days' notice to plaintiff. They maintain that Dr. Scheller was given due notice and his contract terminated. As *6 such, defendants contend the trial court should have directed a verdict in their favor, and that damages for breach of contract should not have been submitted to the jury. Naturally, plaintiff disagrees, and in doing so relies upon Clause Seven of the same employment contract which provides as follows:
SEVENTH  INDEPENDENT CONTRACTOR: In the performance of the work, duties and obligations devolving upon PATHOLOGIST under the terms of this Agreement, it is mutually understood and agreed that PATHOLOGIST shall, at all times, act and perform as an independent contractor practicing the profession of medicine and surgery and specializing in Pathology. HOSPITAL shall neither have nor exercise any control or direction over the methods by which PATHOLOGIST or those assistants, associates or partners of PATHOLOGIST shall perform their work and functions; the sole interest and responsibility of HOSPITAL is to assure that the DEPARTMENT and services covered by this Agreement shall be performed and rendered in a competent, efficient and satisfactory manner. The standards of medical practice and professional duties of PATHOLOGIST shall be determined by the Medical Staff of HOSPITAL. All applicable provisions of law and other rules and regulations of any and all governmental authorities relating to licensure and regulation of physicians and hospitals and to the operation of DEPARTMENT shall be fully complied with by the parties hereto; in addition, the parties shall also operate and conduct the DEPARTMENT in accordance with the standards and recommendations of the Joint Commission on Accreditation of Hospitals, the By-Laws of HOSPITAL, and the By-Laws, Rules and Regulations of the Medical Staff of HOSPITAL as may be in effect from time to time. (Emphasis supplied.)
On the basis of Clause Seven, plaintiff contends that the parties intended to incorporate the by-laws of the medical staff into the employment agreement. Plaintiff introduced the by-laws into evidence and by special interrogatory the jury concluded the parties did intend to incorporate these by-laws into the employment contract. The by-laws, a 75-page document, provide a lengthy statement of policy and procedures governing all aspects of medical practice in the hospital. Article IV concerns staff membership and provides that a "contract physician" must be a member of the "active staff." A physician could not, under the by-laws, become a member of the active staff until he or she had spent one year on the privilege staff and one year on the associate staff. Thus, plaintiff contends his employment contract, as supplemented by the by-laws, was breached when the hospital hired Dr. Hobin to replace him, because Dr. Hobin had not been on the medical staff for two years immediately preceding his hiring and had not attained "active staff" membership.[3] According to plaintiff's theory, he could not be replaced until two years after another pathologist had been on staff and this was almost impossible because economic reality would not allow another doctor to work as a pathologist for two years while the hospital ran its own laboratory in competition with him. Defendants characterize this as plaintiff's "lifetime contract" theory. Plaintiff sought damages before the jury measured by compensation he would have received under the terms of his contract until his probable retirement at age 65, a period of roughly 25 years. On appeal Dr. Scheller seems to disavow the "lifetime contract" theory but at the same time argues:
[h]e was given great security (i.e.), a contract with termination conditions that would allow him to remain as Laboratory Director as long as he chose, because of the practical restrictions on his replacement. Accordingly, ... his damages could be assessed anywhere from two years ... to retirement (age 65). That *7 was for the jury to determine. (Appellee's Brief p. 36).
The defendants' arguments against the contract theory are: (1) that there was no ambiguity, (2) if an ambiguity existed, it had to be resolved against plaintiff as a matter of law, (3) the contract was void for lack of mutuality, and (4) damages were unproven and not recoverable. We conclude that these arguments have merit and that the trial court erred in simply submitting all matters to the jury as issues of fact for their determination. The court should have first employed the established rules of contractual construction and, based thereon, directed a verdict for defendants on the breach of contract count. Here, the burden of initially construing the contract was improperly shifted entirely to the jury. This court has stated the rule to be:
Where, as in the instant case before this court, a contract is clear and unambiguous and does not involve any absurdities or contradictions, it is the best evidence of the intent of the parties, and its meaning and legal effect are questions of law for determination by the court alone [citations omitted] (emphasis added). Innkeepers International, Inc. v. McCoy Motels, Ltd., 324 So.2d 676, 678 (Fla. 4th DCA 1976).
The two clauses in the employment contract, No. Seven governing independent contractors and No. Nineteen governing termination, were unambiguous and unrelated. It was improper to rule that the entire contract became totally ambiguous and totally subject to construction and interpretation by the jury by virtue of the incorporation of the by-laws which contained everything but "the kitchen sink."
Even indulging the argument that the contract was subject to construction, the eventual result remains the same under other established rules of contract law. A true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. It is the duty of the trial court to prevent such interpretations. In Paddock v. Bay Concrete Industries, Inc., 154 So.2d 313 (Fla. 2d DCA 1963), the court stated as follows at 316:
Looking to the other provisions of a contract and to its general scope, if one construction would lead to an absurd conclusion, such interpretation must be abandoned and that adopted which will be more consistent with reason and probability.
Further in James v. Gulf Life Ins. Co., 66 So.2d 62, 63 (Fla. 1953), the court stated:
The inconvenience, hardship, or absurdity of one interpretation of a contract or its contradiction of the general purpose of the contract is weighty evidence that such meaning was not intended when the language is open to an interpretation which is neither absurd nor frivolous and is in agreement with the general purpose of the parties.
A 90 day termination provision and a lifetime contract provision are most obviously inconsistent.
If clauses in contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them, if possible, and if one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability. Triple E Development Co. v. Floridagold Citrus Corp., 51 So.2d 435 (Fla. 1951).
Dr. Scheller's theory of construction renders clauses seven and nineteen irreconcilable and totally destroys the unambiguous language (in the actual contract) in both clauses. The general scope and intent of the contract was obviously not to confer a lifetime benefit on Dr. Scheller. The jury should not have been allowed to render totally ineffectual the clear termination provisions of the contract.
The most compelling argument against the plaintiff's position is the appalling lack of mutuality in the contractual *8 relationship which plaintiff constructs from the combined interplay of the contract and the by-laws. Under plaintiff's construction, he has a lifetime contract at an established rate of compensation; however, did the hospital have any corresponding rights, that is, could the hospital legally rely on Dr. Scheller's staying as lab director at the same rate of pay for the rest of his life? If Dr. Scheller had chosen to retire early at age 55 and given 90 days' notice, could the hospital have collected the same damages from him? We think not. If for no other reason, the contract as constructed by plaintiff is void for lack of mutuality. In sum we find no breach of contract as a matter of law.
The plaintiff's second theory of recovery, intentional interference with the contract, must fail for the same reasons as outlined above. Under this count plaintiff relies on the same lifetime contract asserting interference rather than breach. Plaintiff's liability theory was that AMI and Mr. Bruce interfered with his contract with the hospital. Plaintiff proposed a "two hat theory" whereby Bruce (the hospital administrator) interfered with his own hospital's contract while wearing a separate AMI hat. We have previously held that the plaintiff's theoretical "lifetime  no replacement" contract simply did not exist. It is this contract which was supposedly interfered with. The elements of the tort of intentional interference are: 1) the contract; 2) the wrongdoer's knowledge thereof; 3) his intentional procurement of its breach; 4) the absence of justification; and 5) damages. See Smith v. Ocean State Bank, 335 So.2d 641, 643 (Fla. 1st DCA 1976). Here the contract was one which could be terminated by either party without cause on 90 days' notice. There was no breach of this contract even if we indulge the "two hat theory." Plaintiff's proofs did not establish the basic elements of the cause of action and the court should have also directed a verdict on this count.
The third count, intentional interference with a business relationship, is, however, entirely different. Under this count, Dr. Scheller does not complain about the termination of his employment as lab director nor about his replacement by Dr. Hobin. Instead, Dr. Scheller contends that AMI, Bruce, Hobin, and the hospital interfered with the business relationship he established with the other physicians on the medical staff after he was terminated as lab director. Once again, the theory and the facts are somewhat complex. After Dr. Scheller's employment as lab director terminated, some 63 physicians designated him to perform pathology services for their patients. These doctors were entitled to do so under a staff by-law which provided:
Regardless of an exclusive contract for Pathology, Radiology or the like, a physician with the consent of the Medical Staff may designate a different medical expert in these fields; and that person so designated shall be afforded the full use of the hospital facilities to do his routine work as requested, in which event the medical expert that does the work shall submit the medical fee statement to the patient or the hospital, as the case may be, and there will not be a double billing.
It would appear this by-law was designed to give physicians practicing in the hospital the option of associating an outside pathologist or outside radiologist to function in specific cases in place of the hospital pathologist or radiologist. If a surgeon wished, he could have his radiology work done by an outside physician who was not on the medical staff by designating that outside radiologist as a special medical expert under the by-law. When Dr. Scheller was terminated as lab director, he not only remained on the staff but was also designated by 63 physicians as their own special expert. As such, Dr. Scheller went into competition with Dr. Hobin who was operating the hospital's pathology laboratory. Under the by-law, Dr. Scheller was entitled to "the full use of the hospital facilities to do his routine work." Dr. Scheller claimed at trial that AMI, Bruce, Hobin, and the hospital intentionally interfered with his business relationship with these physicians by denying him copies of the hospital's *9 computerized bills and by barring access to the clinical laboratory.
The elements of a cause of action for intentional interference with an advantageous business relationship are: (1) the existence of an advantageous relationship under which the plaintiff has legal rights, (2) an intentional and unjustified interference with that relationship, and (3) damage to the plaintiff as a result of the defendant's actions. Wackenhut Corp. v. Maimone, 389 So.2d 656 (Fla. 4th DCA 1980). Here, the defendants refused to allow plaintiff to review and interpret test results relating to patients of doctors who had designated Dr. Scheller as their own pathologist. Dr. Scheller was also initially excluded from practicing clinical pathology in the laboratory being run by Dr. Hobin. Indeed, Dr. Scheller went to court in separate suits and obtained two injunctions to prevent the defendants from denying him access to test results and to the clinical laboratory facilities. Both of these injunctions were issued shortly before the main trial took place. The jury was not advised of the injunctions, but appellee has placed heavy reliance on the injunctions in argument before this court. No one has raised the question of how Dr. Scheller can get damages for future interference when that very interference has been twice enjoined by the court in suits between the same parties. Since this issue has not been raised, we do not further address it.
The arguments which defendants do raise are basically factual in nature. They point out that it is uncontested that no physician abandoned or even restricted his business relationship with Dr. Scheller even though the doctor asserts that his own performance was made more difficult or burdensome by the "billing" and "access" problems created by the hospital. In short, the doctor contends the hospital interfered by hindering his performance while the hospital contends he was merely "inconvenienced." The doctor argues that the two injunctions show how bad the "inconvenience" really was, and the hospital urges we should disregard the injunctions because they occurred in different lawsuits and were not admissible before the jury. We are in agreement with the defendants' overall position on this issue. The evidence was that no doctor breached his relationship with the plaintiff. Unsuccessful interference is simply not the kind of interference upon which a tort may be founded or upon which damages may be assessed. In the context of this case, the fact that no doctor abandoned or breached the existing relationship with Dr. Scheller was of crucial significance. Since the relationships between Dr. Scheller and the 63 designating physicians remained intact, there was no cause of action proved and the court should have also directed a verdict on Count III.
In summary, we conclude that the court should have directed verdicts on Counts I, II and III. The final judgment below is thus reversed. We do not determine the cross appeal because it is rendered moot by the foregoing opinion.
REVERSED.
GLICKSTEIN, J., concurs.
SMITH, RUPERT JASEN, Associate Judge, dissents with opinion.
SMITH, RUPERT JASEN, Associate Judge, dissenting.
I respectfully and strongly disagree with the majority opinion rendered in this case. I think there was a breach of contract by the Defendant Hospital and its Administrator Bruce on two counts.
First, the Hospital hired Dr. Frederick P. Hobin before Dr. Zbigniew Scheller's 90 day notice had expired, this is simple.
The second breach is more complex, it is my view that the trial court did err. The court should have decided there was a breach of contract concerning the hiring of a doctor prior to the two year probation period instead of submitting that question to the jury  there was no dispute that Dr. Hobin was hired by the hospital prior to the two year probation period contained in the staff bylaws and, therefore, under the modern *10 view, the staff bylaws become a contract with the staff physicians when approved by the governing body of the hospital.
Florida Statute 395 and Rule 10D-28.58, Florida Administrative Code Annotated, adopted by the Department of Health and Rehabilitative Services, states:
"10D-28.58 MEDICAL STAFF. Each hospital shall have a medical staff organized under written bylaws approved by the governing authority and responsible to the governing authority of the hospital for the quality of all medical care provided to patients in the hospital and for the ethical and professional practices of its members."
It is to be noted that the Joint Committee on Hospital Accreditation also requires the medical staff to have its own bylaws.
The modern view holds that the medical staff bylaws, when approved by the governing board of the hospital, become a contract between the hospital, operated by a Governing Board and the physicians composing the medical staff. See the following cases: Berberian v. Lancaster Osteopathic Hospital Association, 395 Pa. 257, 149 A.2d 456 (1959); Joseph v. Passaic Hospital Association, 26 N.J. 557, 141 A.2d 18 (1958); Miller v. Indiana Hospital, 277 Pa. Super. 370, 419 A.2d 1191 (1980); The Anne Arundel General Hospital, Inc., et al. v. O'Brien, et al., 49 Md. App. 362, 432 A.2d 483 (1981); St. John's Hospital Medical Staff v. St. John Regional Medical Center, Inc., 90 S.D. 674, 245 N.W.2d 472 (1976); O'Leary, et al. v. Board of Director, Howard Young Medical Center, Inc., et al., 89 Wis.2d 156, 278 N.W.2d 217 (1979).
In the Passaic Hospital case cited above the Court held:
"The medical staff bylaws were ratified by the Board of Governors, and thereby became a constituent part of the association's elemental law."
Also, in The Anne Arundel Hospital case, the Court stated:
"It is well settled that hospital bylaws have the force and effect of an enforceable contract."
The next question to be answered is, do they enure to the benefit of individual staff members, i.e., doctors, or do they enure to the staff association? In areas that affect the physicians collectively the law provides that the bylaws would apply collectively; in those areas that affect an individual physician the law provides that the staff bylaws would apply individually.
Since bylaws are a contract between the physicians and the hospital, the hospital without question breached the contract (staff bylaws which in this case enured to Dr. Scheller)! The trial judge should have submitted the issue of damages to the jury for determination of breach of contract. Since the trial judge submitted the issue of whether there was a factual breach of contract to the jury for determination and the jury answered that question in the affirmative, as should have the trial judge, this error is harmless.
The next question is the amount of actual damages  it is too speculative to allow the jury to award damages to age 65 for Dr. Scheller. I would send this question back to the jury for the sole determination of actual damages for the breach of contract. It is my suspicion that the jury awarded Dr. Scheller the $1,250,000.00 as an indication that the community will not tolerate hospital administrators to treat the staff physicians in such a cavalier manner.
The punitive damages should be disallowed and a new trial should be granted on the issue of punitive damages, unless the plaintiff accepts a remittitur of 50 per cent on all awards of punitive damages including Mr. T.R. Bruce's, in my opinion, it was error for the trial judge to set his award aside, especially since he was the driving force behind this controversy. Administrators of hospitals should be aware that the law will not allow them dictatorial powers! My further belief is the jury allowed these punitive damage awards as a message to hospitals everywhere that the public will not endure below standard laboratories and *11 other facilities in hospitals, especially after physicians have complained about conditions. Who else should complain except the physicians who are charged with seeing that high standards of health care are maintained, not only does the law require this of the doctors, also their staff bylaws, their code of ethics and also by various accreditation committees recommendations.
The reasoning for reducing the punitive damage awards by 50 per cent is that the amounts shock my judicial conscience  while the hospitals will pay this amount, the ultimate burden will be on the patients of these hospitals, it is unrealistic to deny that the hospital corporation will not pass some of these amounts on as increased patient costs, however, there was ample evidence to justify punitive damages.
The other theories of liability are immaterial in view of this holding.
PER CURIAM.
The petition for rehearing and the en banc motion to vacate court's decision and to transfer case to another district court for resolution are denied. The request for oral argument and to consider en banc motion as regular motion are rendered moot.
DOWNEY and GLICKSTEIN, JJ., concur in the denial of the petition for rehearing.
SMITH, RUPERT JASEN, Associate Judge, dissents from the denial of rehearing.
ANSTEAD, C.J., and DOWNEY, HERSEY, GLICKSTEIN, HURLEY and DELL, JJ., concur in the denial of en banc motion.
LETTS, J., specially concurs in denial of en banc motion.
WALDEN and BARKETT, JJ., recuse themselves from consideration of en banc motion.
LETTS, Judge, specially concurring.
There has been no request for rehearing en banc in this case. This being so I am precluded from considering the decision on its merits.
As I view this matter, the question of whether I should vote to disqualify this entire court and as a necessarily included disqualification, myself, is not controlled by any of the cases cited, but rather by In re Estate of Carlton, 378 So.2d 1212 (Fla. 1979). True, Carlton did not involve a fact situation on all fours with the case at bar. However, it stands for the proposition that an appellate judge is not subject to the dictates of Chapter 38 of the Florida Statutes, and that he must, in the exercise of his personal discretion, determine for himself the legal sufficiency of the request and the propriety of his withdrawing. I can discover no legal sufficiency for the request, but I do find it would be improper for this court to withdraw because it would "adversely and unjustly affect the successful party in the cause." See Carlton, supra, at 1220.
NOTES
[1] The verdict returned by the jury was as follows:
 IN THE CIRCUIT COURT OF THE FIFTEENTH
 JUDICIAL CIRCUIT, IN AND FOR PALM
 BEACH COUNTY, FLORIDA
 CASE NO. 79-3358 CA (L) 01 F
 ZBIGNIEW SCHELLER,
 Plaintiff,
 vs.
 AMERICAN MEDICAL INTERNATIONAL,
 INC., a foreign corporation for
 profit, PALM BEACH GARDENS COMMUNITY
 HOSPITAL, INC., a Florida corporation
 for profit, FREDERICK P. HOBIN, M.D.,
 and T.R. BRUCE, JR.,
 Defendants.
_______________________________________

VERDICT
We, the Jury, find the following:
1. As to Count II for breach of the written contract, do you find that:
(a) At the time PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., entered into the contract with Fred Hobin, the Medical Staff Bylaws contained this provision: "Any physician holding a contract with the Hospital must be a member of the active Medical Staff?"
 YES X NO ____
If your answer to 1(a) above was YES, then answer the following question:
(b) At the time they executed the contract on May 12, 1975, was it the intent of ZBIGNIEW SCHELLER and PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., to incorporate that provision into their contract?
 YES X NO ____
If your answer to 1(b) was YES, then answer the following question:
(c) Was it the intent of the Hospital and the Medical Staff at the time the Bylaws were adopted that this provision meant that the Hospital could not contract with a physician until that physician had been a member of the Medical Staff for at least two years and had been elevated to Active Staff membership?
 YES X NO ____
If your answer to 1(c) above was YES, then answer the following question:
(d) Was this provision an essential and material term or condition of the contract?
 YES X NO ____
If your answer to 1(d) above was YES, then answer the following question:
(e) Did the Hospital violate this provision of the contract by entering into a contract with Fred Hobin who was not a "member of the active Medical Staff?"
 YES X NO ____
2. If you find the Defendant, PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., liable to the Plaintiff for breach of contract, then state the amount of compensatory damages sustained by the Plaintiff as a consequence of such conduct: $1,250,000.00.
3. Do you find the Defendant, AMERICAN MEDICAL INTERNATIONAL, INC., liable to the Plaintiff for:
(a) Tortious interference with the contract between the Plaintiff and PALM BEACH GARDENS COMMUNITY HOSPITAL, INC.,?
 YES X NO ____
(b) For tortious interference with an advantageous business relationship between the Plaintiff and certain members of the Medical Staff?
 YES X NO ____
4. Do you find the Defendant, T.R. BRUCE, JR., liable to the Plaintiff for:
(a) Tortious interference with the contract between the plaintiff and PALM BEACH GARDENS COMMUNITY HOSPITAL, INC.,"
 YES X NO ____
(b) For tortious interference with an advantageous business relationship between the Plaintiff and certain members of the Medical Staff?
 YES X NO ____
5. Do you find the Defendant, FREDERICK P. HOBIN, M.D., liable to the Plaintiff for:
(a) Tortious interference with the contract between the Plaintiff and PALM BEACH GARDENS COMMUNITY HOSPITAL, INC.,?
 YES ____ No X 
(b) For tortious interference with an advantageous business relationship between the Plaintiff and certain members of the Medical Staff?
 YES ____ No X 
6. Do you find the Defendant, PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., liable to the Plaintiff for:
(a) Tortious interference with an advantageous business relationship between the Plaintiff and certain members of the Medical Staff?
 YES X NO ____
7. If one or more of the Defendants have been found liable for tortious interference with the contract between the Plaintiff and PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., then state the amount of compensatory damages sustained by the Plaintiff as a consequence of such conduct: $1,250,000.00.
8. If one or more of the Defendants have been found liable for tortious interference with an advantageous business relationship between the Plaintiff and certain members of the Medical Staff, then state the amount of compensatory damages sustained by the Plaintiff as a consequence of such conduct: $1,250,000.00.
9. If you have found the Defendant, AMERICAN MEDICAL INTERNATIONAL, INC., liable to the Plaintiff for any of the alleged acts (that is, if you answered "YES" to 3(a), or (b), then do you find that AMERICAN MEDICAL INTERNATIONAL, INC., is required to pay punitive damages, and, if so, what is the amount of punitive damages fixed by you?
 PUNITIVE DAMAGES  YES X 
 NO ____
 AMOUNT: $4,000,000.00
10. If you have found the Defendant, T.R. BRUCE, JR., liable to the Plaintiff for any of the alleged acts (that is, if you answered "YES" to 4(a) or (b), then do you find that T.R. BRUCE, JR., is required to pay punitive damages, and, if so, what is the amount of punitive damages fixed by you?
 PUNITIVE DAMAGES  YES X 
 NO ____
 AMOUNT: $1,000,000.00
11. If you have found the Defendant, PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., liable to the Plaintiff for tortious interference with an advantageous business relationship (that is, if you answered "YES" to 6(a), then do you find that PALM BEACH GARDENS COMMUNITY HOSPITAL, INC., is required to pay punitive damages, and, if so, what is the amount of punitive damages fixed by you?
 PUNITIVE DAMAGES  YES X 
 NO ____
 AMOUNT: $1,000,000.00
SO SAY WE ALL.
DATED this 31st day of May, 1980, at West Palm Beach, Palm Beach County, Florida.
 /s/ Bart Kelleher
 Foreperson

[2] A provision in the medical staff bylaws allowed any staff doctor to designate an outside specialist in pathology or radiology. Dr. Scheller was so designated by a substantial number of staff doctors and thus continued to practice extensively as a pathologist in the hospital despite the fact he was no longer lab director.
[3] Dr. Hobin had previously been the director of the hospital laboratory but had left the hospital's employment prior to Dr. Scheller's signing his initial contract on May 12, 1975.