NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


MARK P. FAMIGLIO,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Appellant,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　Case No. 2D18-467
　　　　　　　　　　　　　　　　　　)
JENNIE LASCELLE FAMIGLIO,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Appellee.　　　　　　　　)
_____)

Opinion filed May 10, 2019.

Appeal from the Circuit Court for DeSoto
County; Kimberly Carlton Bonner, Judge.

Douglas A. Wallace and Steven L.
Brannock of Brannock & Humphries,
Tampa, for Appellant.

Charles J. Bartlett and Mark C. Dungan of
Icard, Merrill, Cullis, Timm, Furen &
Ginsburg, P.A., Sarasota, for Appellee.


LUCAS, Judge.

　　　　　The tiniest words can have the greatest consequence. In this appeal of a

judgment interpreting a prenuptial agreement, the word "a," the smallest of words in the

English language, could mean the difference of a million and a half dollars.

I.

Weeks before their marriage in 2006, Mark Famiglio (the Husband) and

Jennie Lascelle Famiglio (the Wife) entered into a Prenuptial Agreement. Among other

items, the Prenuptial Agreement addressed the extent of lump sum alimony the Wife

would receive in the event the parties divorced. Pertinent here, the agreement provided

as follows[1]:

> 5.1. In the event the marriage of the parties is dissolved by a court of competent jurisdiction, then the parties shall have no obligation to make payments of any kind or for any purpose to or on behalf of the other, except as specifically set forth in Paragraph 5.2 and 5.3.
>
> 5.3. JENNIE's Benefits and Obligations. If the marriage ends by dissolution of marriage or an action for dissolution of marriage is pending at the time of MARK's death, then JENNIE shall receive the additional benefits and obligations described in 5.3.a. through d.
>
>> a. MARK shall pay to JENNIE, within ninety (90) days of the date either party files a Petition for Dissolution of Marriage the amount listed below next to the number of full years they have been married *at the time a Petition for Dissolution of Marriage is filed*.

(Emphasis added.)

Section 5.3.a. included two columns reflecting a gradually escalating

schedule of money for each full year of marriage. Thus, for example, if a petition for

dissolution of marriage were filed after seven full years of marriage, the Wife would

---

[1]Our record does not include the Prenuptial Agreement due to the inadvertent omission of its filing by the trial court. However, the order on appeal recites the applicable provisions of the agreement, which the parties agree are accurate and sufficient to enable our review of the discrete interpretive issue in this appeal.

receive $2.7 million; if a petition were filed after ten full years of marriage, the Wife would receive $4.2 million.

As it happened, two different petitions were filed in two different years.

On March 25, 2013, the Wife filed a petition for dissolution of marriage in the Sarasota County Circuit Court. At that time, the parties would have been married for seven full years under the Prenuptial Agreement. That petition was never served, however, and on September 13, 2013, the Wife voluntarily dismissed the petition without prejudice.

On May 26, 2016, the Wife filed a second petition for dissolution of marriage in the Sarasota County Circuit Court. By this time, the parties had been married ten full years for purposes of section 5.3 of the Prenuptial Agreement. The litigation pertaining to this second petition remains pending.

The Husband then filed the underlying action for declaratory relief, seeking the court's construction of various provisions in the parties' Prenuptial Agreement.[2] Relevant to this appeal, the Husband maintained that the Wife's filing of the first petition in 2013 became the operative year of measurement for purposes of section 5.3, so that she would be entitled to a payment of $2.7 million. The Wife argued that her second petition, the one that would result in an actual dissolution of the parties' marriage, controlled the operation of section 5.3. According to the Wife, she should receive $4.2 million under this provision of the Prenuptial Agreement.

_____

[2]This action was brought separately in the DeSoto County Circuit Court pursuant to separate provisions in the Prenuptial Agreement.

The Husband's declaratory action proceeded to trial on December 6, 2017. No witnesses testified; no evidence other than the Prenuptial Agreement was proffered. Both sides, Husband and Wife, believed the agreement was clear and unambiguous and could be construed in their favor.

On January 9, 2018, the trial court entered a Final Order of Declaratory Judgment, the judgment now on appeal. Regarding the measurement of years, the trial court observed that section 5.3's title and conditions speak to the parties' rights and obligations arising from a dissolution of marriage. Thus,

> [i]t follows logically and reasonably that the obligations under 5.2 and 5.3 arise only after an actual dissolution of marriage and do not impose post filing obligations. . . . Furthermore, the entirety of section 5.3 by its own terms applies, "If the marriage ends by dissolution of marriage . . . ." The Agreement does not provide any rights or obligations stemming from the mere filing of a Petition, unless such a Petition is pending at the time of [H]usband's death as stated in section 5.3.
>
> The Court is unpersuaded that some deliberate choice of the article "a" instead of "the" in 5.3 dictates the result in this action. Although it is true that articles have specific meaning, this case presents a question of contractual interpretation, which requires the court to examine the disputed provision as part of the whole agreement and not in isolation. When read as a whole, the provision in question can only be consistently and logically interpreted to apply to the parties' obligations "In the event the marriage of the parties is dissolved. . . ." Any other conclusion would be inconsistent with the express intent and language of the Agreement. It would also lead to multiple absurd results that undermine the stated purpose of the Agreement.

The "multiple absurd results" the court alluded to were various hypotheticals the parties proposed: under the Husband's proposed interpretation, he could have simply filed, but never served, a dissolution petition in year one of the marriage to permanently limit his

financial obligations no matter how long the marriage actually lasted (a seemingly inequitable result); but under the Wife's proposed interpretation, she could have filed and dismissed a petition every year in order to require a lump sum payment from the Husband within 90 days of each filing, regardless of the fact that the marriage is never dissolved (also a seemingly inequitable result). Ultimately, the trial court concluded that "the timing of the payment under section 5.3 is triggered by a dissolution of marriage, [t]he schedule of payments is determined by the date a Petition was filed, when that Petition results in a dissolution of marriage." Accordingly, the court held, the Wife's 2016 petition would be the controlling petition for the purpose of determining her lump sum alimony under section 5.3.

In this appeal, the Husband asks us to reverse that part of the trial court's declaration that construed his payment obligation under section 5.3 as being tied to the date a petition for dissolution of marriage was filed "when that Petition results in a dissolution of marriage." He believes "a" means "any," and in this case "any" should mean the first petition the Wife filed in 2013.

II.

A prenuptial agreement is governed by the law of contracts; as such, we review the trial court's interpretation of the parties' Prenuptial Agreement de novo. See Hahamovitch v. Hahamovitch, 174 So. 3d 983, 986 (Fla. 2015). "Because the decision is a matter of law, this court is on equal footing with the trial court's interpretation of the contract." Gemini Ventures of Tampa, Inc. v. Hamilton Eng'g & Surveying, Inc., 784 So. 2d 1179, 1180 (Fla. 2d DCA 2001); see also Jarrard v. Jarrard, 157 So. 3d 332, 337

(Fla. 2d DCA 2015) (observing that for pure issues of law, "the trial court has no greater insight than the appellate court").

Throughout the proceedings below, both parties steadfastly maintained that section 5.3 is clear and unambiguous on the discrete question before us. The trial court's judgment did not expressly declare the provision to be unambiguous, but neither did it find to the contrary.[3] From our review of the trial court's analysis, it appears to us that the court deemed section 5.3 to be unambiguous on the question of which dissolution petition should be utilized to measure the Wife's alimony.

Now an argument could have been made that there was an ambiguity here. Section 5.3 seems to contemplate only one petition for dissolution of marriage being filed, and it does not at all address the situation presented here where more than one petition has been filed. One could argue the provision in this case might pose a latent ambiguity. Cf. Morrison v. Morrison, 247 So. 3d 604, 607 (Fla. 2d DCA 2018) ("A latent ambiguity arises when the language in a contract is clear and intelligible, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice

---

[3]We pause to offer a suggestion to trial courts confronted with competing interpretations of a written agreement. In such cases, the court's ruling should include a preliminary determination of whether the language at issue is either clear or ambiguous. Cf. Strama v. Union Fid. Life Ins. Co., 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001) ("*The initial determination* of whether the contract term is ambiguous is a question of law for the court, and if the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law." (emphasis added)); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995) (applying Pennsylvania law and noting, "[t]herefore, as a preliminary matter, courts must 'determin[e] as a matter of law which category written contract terms fall into—clear or ambiguous.' " (quoting Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994))). Besides the obvious legal ramifications, this threshold issue in contract disputes—whether a term is ambiguous or not—can impact the advocacy and approach the litigants will choose to undertake in presenting their cases.

between two or more possible meanings." (quoting GE Fanuc Intelligent Platforms Embedded v. Brijot Imaging Sys., Inc., 51 So. 3d 1243, 1245 (Fla. 5th DCA 2011))). Had the trial court concluded there was a latent ambiguity, the parties could have submitted parol evidence to assist the court's interpretation of the provision's competing meanings. Id.; see also Elias v. Elias, 152 So. 3d 749, 752 (Fla. 4th DCA 2014); Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So. 2d 544, 547 (Fla. 1st DCA 1973) ("Where, under a latent ambiguity which is presented the intent may have been for one of two things, it is permissible, and is the duty of the court to receive and consider extrinsic evidence bearing thereon.").

We are, however, constrained by this record to proceed along the same course the trial court undertook. We can only work with what has been provided, and what has been provided here (as it was below), comprises of the agreement itself and the very capable arguments of counsel. With that, we will turn to our review of the trial court's interpretation of the language in section 5.3.a.

It is, of course, well settled that "[w]hen interpreting a contract, the court must first examine the plain language of the contract for evidence of the parties' intent." Heiny v. Heiny, 113 So. 3d 897, 900 (Fla. 2d DCA 2013) (quoting Murley v. Wiedamann, 25 So. 3d 27, 29 (Fla. 2d DCA 2009)). Provisions in a contract should be "construed in the context of the entire agreement" and read "in a way that gives effect to all of the contract's provisions." Retreat at Port of Islands, LLC v. Port of Islands Resort Hotel Condo. Ass'n, 181 So. 3d 531, 533 (Fla. 2d DCA 2015). Courts should not employ an interpretation of a contractual provision that would lead to an absurd result. See Interline Brands, Inc. v. Chartis Specialty Ins. Co., 749 F.3d 962, 966 (11th Cir.

- 7 -

2014) ("Under Florida law, 'if one interpretation looking to the other provisions of the contract and to its general object and scope would lead to an absurd conclusion, such interpretation must be abandoned, and that adopted which will be more consistent with reason and probability.' " (quoting Inter-Ocean Cas. Co. v. Hunt, 189 So. 240, 243 (Fla. 1939))). On the other hand, "[i]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties," Barakat v. Broward Cty. Hous. Auth., 771 So. 2d 1193, 1195 (Fla. 4th DCA 2000), or, in the guise of interpretation, relieve a contracting party from the consequences of a bad bargain, Prestige Valet, Inc. v. Mendel, 14 So. 3d 282, 283 (Fla. 2d DCA 2009).

Much of the trial court's interpretation rested upon its assessment that the indefinite article "a" in section 5.3's term, "at the time a Petition for Dissolution of Marriage is filed," holds no real importance. We respectfully disagree. The use of this indefinite article is the heart of the problem here.

The purpose of the indefinite article is to indicate a noun that is, in some way, variable, unidentified, or unspecified. See Retreat at Port of Islands, 181 So. 3d at 533 ("Linguistically, 'a' refers to 'any or each' of a type when used with a subsequent restrictive modifier."). The word "a" is "a function word before singular nouns when the referent is unspecified." Merriam-Webster's Collegiate Dictionary 1 (11th ed. 2003). As used in section 5.3.a., the indefinite article "a" indicates the generic, possible occurrence of an unspecified petition for dissolution of marriage being filed by one of the parties. But the overarching purpose of section 5.3.a. was to calculate an alimony payment based upon a petition that has been filed on a singular, particular date. By utilizing an indefinite article here, the filing date measurement of section 5.3.a. leaves

open the possibility that more than one petition for dissolution of marriage could be filed, but does not inform the parties which petition's filing should be the operative date for measuring if that were to occur. So, given this language, which date should be used if more than one petition has been filed?

The trial court essentially side-stepped the problem by tacking words onto the provision. According to the trial court's construction, the yearly measurement in section 5.3.a. is made by referring to the date a dissolution petition is filed "when that Petition results in a dissolution of marriage." Unfortunately, as clarifying as it would seem, that is a term of the trial court's invention. See Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co., 133 So. 3d 494, 497 (Fla. 2014) ("Courts may not 'rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties.' " (quoting Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005))); 19650 NE 18th Ave. LLC v. Presidential Estates Homeowners Ass'n, 103 So. 3d 191, 194 (Fla. 3d DCA 2012) (reversing trial court's interpretation of a restrictive covenant because the court "effectively added a forfeiture provision to confiscate the development rights when the requirements of the covenant were not met. A court may not rewrite a contract to add language the parties did not contemplate at the time of execution" (citing BMW of N. Am., Inc. v. Krathen, 471 So. 2d 585, 587 (Fla. 4th DCA 1985))); cf. Smith v. Bankers Life Ass'n of Des Moines, Iowa, 123 Ill. App. 392, 395-96 (Ill. App. Ct. 1905) (holding that insurance policy application's question, "How long since you consulted a physician?" was ambiguous because "it might mean, how long since you *first* consulted a physician, or how long since you *last* did so" and reversing trial court's instruction as it "in effect arbitrarily inserted the word 'last' ").

Nor does the larger context the trial court discerned for sections 5.1, 5.2, and 5.3—the dissolution of the parties' marriage—necessarily lead to the conclusion that the discrete measurement in section 5.3.a. could only be tied to a petition that results in a dissolution of marriage. These sections generally address the context of a dissolution of marriage, to be sure, but that is not because of any unique facet of these sections' inter-relatedness with one another. It is because they are part of a prenuptial agreement. The point of this whole agreement was to address and ascribe the parties' rights and obligations in the event their marriage is dissolved. Thus, section 5.1's prefatory "In the event the marriage of the parties is dissolved by a court of competent jurisdiction," and 5.3's "If the marriage ends by dissolution" simply acknowledge that the Husband's responsibility to make the lump sum alimony payment—of whatever amount—will be contingent upon the parties' marriage being dissolved. It does not follow that section 5.3.a's "a petition" somehow becomes "the petition that happens to result in a final judgment of dissolution of marriage" by virtue of context alone, especially where, as here, an alternative interpretation could just as reasonably be supported by the operative language.[4]

_____

[4]The Wife also argues that the context of these sections illustrates an intent that the lump sum alimony payment should more closely reflect the total number of years the parties were actually married by the time their marriage is dissolved. Perhaps. Or perhaps, as the Husband counters, the underlying intent could have been that initiating "a petition" for dissolution of marriage was deemed to be so momentous that the parties agreed to tie an attendant consequence to its very filing. Both intentions are equally plausible and, on this record, equally unknowable.

It should also be noted that the timing of the required payment in section 5.3—90 days from the date "a petition" is filed—could be read to imply that the obligation becomes operative *regardless* of whether the petition results in the marriage's dissolution. It seems difficult to fully reconcile this part of the provision with either of the interpretations espoused by the parties.

Finally, the trial court's invocation of the absurdity canon of contractual construction is unavailing here. Tellingly, no one has suggested that the actual application of either of the competing interpretations for section 5.3.a. would be absurd in this case. Under either reading the Wife will receive a significant lump sum alimony payment. The trial court's judgment recounted *hypothetical scenarios* that could be deemed absurd if the court were to apply the parties' competing interpretations *under those hypothetical facts*. But that is not how this canon of contract construction is really supposed to work. Cf. Morrison, 247 So. 3d at 608 ("[A]n interpretation that leads to an absurd *result* . . . should be avoided." (emphasis added)); Am. Med. Int'l, Inc. v. Scheller, 462 So. 2d 1, 7 (Fla. 4th DCA 1984) ("Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible."). The trial court's analysis of this point appears to have conflated an interpretive *reductio ad absurdum* argument about the provision with a finding that the provision actually yielded an absurd result. Whether one construes section 5.3.a. as measuring the Wife's lump sum alimony from the filing of her 2013 petition or her 2016 petition, the result will not be absurd.

Neither the context of section 5.3.a. nor the canon of absurdity casts any light on the quandary. We can only rely on the natural meaning of the phrase: "at the time a Petition for Dissolution of Marriage is filed." See In re Guardianship of Sapp, 868 So. 2d 687, 691 (Fla. 2d DCA 2004) ("Words and phrases should be given their natural meaning or a meaning most commonly understood in relation to the subject matter and circumstances."); J.N. Laliotis Eng'g Constr., Inc. v. Mastor, 558 So. 2d 67, 68 (Fla. 2d DCA 1990) ("Words used in an agreement should be given 'a natural meaning or the

meaning most commonly understood in relation to the subject matter and circumstances.' " (quoting <u>Granados Quinones v. Swiss Bank Corp.</u>, 509 So. 2d 273, 275 (Fla. 1987))).  As we observed at the outset, it seems clear that the intent of this discrete provision is to link the lump sum alimony measurement to a singular occurrence—when a petition is filed with a court.  <u>Cf.</u> <u>The American Heritage Dictionary of the English Language</u> 8057 (3d ed. 2000) ("when . . . *conj.* 1. At the time that").  In common parlance, predicating a condition on "when something occurs" or "at the time something occurs," is normally understood to mean the first time that the something occurs.  This is so because conditional statements such as these are made with a view towards the future, as a way of indicating that a consequent condition will arise from a future condition's occurrence.  And since the future cannot be known (except in hindsight), we would ordinarily read a provision like section 5.3.a. to align with the way we experience the passing of temporal events; that is, we would consider the future condition's first occurrence to be the operative one, even if it is a condition that might be capable of repetition.  Thus, a golf course's rule, "when a thunderstorm approaches, you must end your golf game," would be universally understood to mean the first time a thunderstorm approaches.  Certainly, more than one storm might come and go throughout the day, but the rule would make little sense if it were construed to mean whichever storm the golfer chooses, so long as the game is ended.

That is how section 5.3.a. must be understood.  Its natural meaning and frame of reference is to tie, prospectively, a variable sum of alimony on the singular occurrence of the filing of "a petition" for dissolution of marriage, which, in its most usual

sense, would mean the first time such a petition is filed.  In this case, that occurred on March 25, 2013.

III.

Accordingly, we affirm the judgment below in all respects except as to the measurement of the Wife's lump sum alimony under section 5.3.a.  We remand this case for the court to enter an amended judgment utilizing the 2013 petition as the year of measurement for purposes of this section of the parties' prenuptial agreement.

Affirmed in part; reversed in part; remanded with instructions.

VILLANTI, J., Concurs.
ATKINSON, J., Concurs with opinion.

ATKINSON, Judge, Concurring.

I fully concur with the majority opinion except as otherwise explained herein.  I write separately to acknowledge that there is a latent ambiguity in the Prenuptial Agreement, but not the one identified by the majority.  See Maj. Op. supra Section II.  The ambiguity is as to when the payment is to be made, and it is irrelevant to the separate question at issue in this case—the amount of the payment, which is governed by plain language found in section 5.3.a. of the Prenuptial Agreement.

The latent ambiguity regarding timing of the payment is one that would arise in the almost inevitable event that more than ninety days elapses between the time "either party files a Petition for Dissolution of Marriage," under section 5.3.a., and the time the marriage is actually "dissolved by a court of competent jurisdiction," under section 5.1 (i.e., "ends by dissolution," under section 5.3).  In that scenario, the payment

- 13 -

comes due at ninety days, but the Wife's entitlement to receive the payment does not arise until the marriage has actually been dissolved.  In other words, the Husband is required to pay within ninety days of the filing of a petition for dissolution of marriage, but only if that petition eventually results in an actual dissolution of marriage.[5]

However, reconciliation of those two requirements does not necessitate abrogation of the plain language of the Agreement determining the <u>amount</u> of the payment.  The question to be resolved in this appeal would only have arisen in the less likely event that two dissolution petitions have been filed.  It involves a separate matter of interpretation, one resolved by a provision of the Agreement that does not create an ambiguity: "the amount listed below next to the number of full years they have been married at the time a Petition for Dissolution of Marriage is filed."  In other words, the question whether or not the husband is late on his payment obligation will not arise until a judgment of dissolution is entered; the question of the amount of that payment is a different calculation altogether.  As ably explained in the majority opinion, the latter question is answered by the plain meaning of the language basing the amount on the filing of "a" dissolution petition, which ordinarily means the first one.  <u>Golf Scoring Sys. Unlimited, Inc. v. Remedio</u>, 877 So. 2d 827, 829 (Fla. 4the DCA 2004) ("When

---

[5]Although the trial court pointed out this inconsistency, it did not explicitly characterize it as a latent ambiguity.  At the risk of coining a phrase, perhaps it could be more aptly described as a <u>barely</u> latent ambiguity, since, as the trial court noted, both parties acknowledged the near impossibility that a final judgment of dissolution would be entered within ninety days of the filing of a petition for dissolution.  Relatedly, I do not agree with the majority's assumption that we must infer that the trial court found section 5.3 of the Prenuptial Agreement to be unambiguous on the question of which petition determines the amount of the payment.  <u>See</u> Maj. Op. <u>supra</u> Section II & n.3.  I believe the trial court identified inconsistencies in the Prenuptial Agreement but incorrectly resolved them in favor of a reading that only the petition that results in a dissolution should determine the amount of the payment.

interpreting a contract, a court should give effect to the plain and ordinary meaning of its terms.").