511 So.2d 559 (1986)
HOSPITAL CORPORATION OF LAKE WORTH and Hospital Corporation of America, Appellants,
v.
Raul ROMAGUERA, M.D., Appellee.
No. 85-611.
District Court of Appeal of Florida, Fourth District.
September 17, 1986.
On Rehearing September 9, 1987.
Larry Klein of Klein & Beranek, P.A., West Palm Beach, and Conrad, Scherer & James, Fort Lauderdale, for appellants.
Charles C. Powers of Charles C. Powers, P.A., West Palm Beach, for appellee.
William A. Bell of The Florida Hosp. Ass'n, Tallahassee, and Leonard H. Gilbert, Sylvia H. Walbolt, Barbara R. Pankau, and R. Andrew Rock of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, for amicus curiae, Florida Hosp. Ass'n.
LETTS, Judge.
A hospital here appeals a final judgment predicated on a jury verdict in favor of a pathologist whose exclusive contract with the hospital, and thereafter his staff privileges, were both terminated. We reverse in part.
It is standard practice nowadays to award exclusive franchises to medical doctor groups to perform all of the hospital's work, on a contract basis, in such areas as pathology, radiology and anesthesiology. Dos Santos v. Columbus-Cuneo-Cabrini Medical Center, 684 F.2d 1346, 1351 (7th Cir.1982). The pathologist in this case had such a contract from which, in 1981 for example, his P.A. grossed over $717,000 *560 out of which he only paid two associates $110,000.
By its terms, the contract was terminable without cause upon 120 days' notice by either party. It further provided that upon termination, all medical staff privileges would also be withdrawn. The language was unequivocally lucid and this lawsuit undoubtedly never would have arisen, were it not for a subsequent amendment, not to the contract itself, but to the hospital by-laws. This change in the by-laws provided that physicians:
in a medico/administrative position i.e. physicians who interpret EKGs, EEGs etc. may be terminated according to their contract with the hospital. However this does not affect their staff privileges in attending patients in any way.
Allegedly, this amendment modified the contract between the hospital and any medico/administrative physician so that the latter, even if his or her contract were terminated, could continue on the staff. After the adoption of this by-law amendment, the hospital did terminate the pathologist's exclusive contract, awarded it to a competing medical group and took the position that the amendment to the by-laws did not apply to the pathologist/plaintiff and that he, according to the specific language of his individual terminated contract, was not entitled to retain his staff privileges at the hospital.

BY-LAW AMENDMENT
Addressing first the threshold issue of the by-laws amendment, we note that the trial judge held as a matter of law that it modified the exclusive contract and also applied to the plaintiff. We find nothing reversible in the trial court's ruling on this issue.
The hospital argues that the exclusive contract in question specifically provides that it cannot be modified, changed or amended except in writing. The hospital admits that bilateral contracts are capable of modification, but only if there is mutual assent and consideration, see Murphy v. Royal American Industries, Inc., 188 So.2d 884 (Fla. 4th DCA 1966). The hospital insists there was neither assent nor consideration for the amendment. Not so.
First of all, this hospital-for-profit did not execute the by-laws amendment out of gratuitous compassion for its contract physicians. On the contrary, the highly self-serving purpose, and therefore consideration, was to facilitate retention of the benefits bestowed upon it by the Joint Commission on Accreditation of Hospitals. Obviously, that consideration accrued to the benefit of any doctor eligible as a "medico/administrative" physician. As to assent, the record reflects that the pathologist/plaintiff participated in hospital board meetings, at which the by-laws amendment was discussed and approved. It goes without saying that the hospital would be held to have assented to its own adopted by-laws. The requirement that any modification be in writing was satisfied by the written amendment itself.
Furthermore, while we agree that a hospital cannot constrict any physician's individual rights under a contract, we see no reason why those rights cannot be expanded by way of a by-laws amendment applied hospital-wide. See Palm Beach-Martin County Medical Center, Inc. v. Panaro, 431 So.2d 1023 (Fla. 4th DCA 1983). The hospital's argument that the amendment was a unilateral act which had no bearing on individual contracts with physicians is rejected. Were we to adopt such an argument, it would apply equally to any contract physician in a "medico/administrative position," thus rendering the language, and the very existence, of the amendment illusory. Obviously, the amendment was not adopted as a total non sequitur. We are not unaware of the case of American Medical International, Inc. v. Scheller, 462 So.2d 1 (Fla. 4th DCA 1984), pet. for rev. denied, 471 So.2d 44 (Fla. 1985), which might be construed to stand for the proposition that general by-laws cannot modify an individual contract because of an "appalling lack of mutuality." However, Scheller was concerned with the incorporation into the exclusive contract of 75 pages of by-law provisions "contain[ing] everything but the `kitchen *561 sink'." In the cause at hand, we are interpreting one short by-law provision which specifically alludes to the consequence of termination of contracts such as the very one now before us. That amendment particularly provides that termination of any such contract (which is what transpired) will not carry with it a concomitant loss of staff privileges. So be it.
Finally, we comment on the amicus brief filed by the Florida Hospital Association on this same issue. The Association not only "strongly supports the right of hospitals to enter into an exclusive arrangement," but also points out that in order to "implement such an arrangement it may be necessary to terminate staff privileges of physicians who are not parties to the exclusive contract." We have no quarrel with that laudable aim and it can be easily accomplished by appropriate language in either the exclusive contract, the by-laws, or both. What we do quarrel with is that which smacks of two sets of books, one to present to the Joint Commission on Accreditation to establish that the physician does retain his staff privileges and the other to present to the luckless physician in order to enforce cancellation of those very same privileges which the hospital has led the Joint Commission to believe he could retain.
We cannot agree, under the facts of this particular case, that the trial court's view of this hospital's lack of authority to terminate staff privileges was, as the Association terms it, "restrictive." The trial court was stuck, as are we, with the record and documents presented to it. It should not prove too difficult to persuade physicians, at contract renewal time, to agree to modifications of their contracts, and any by-laws, which will accomplish the laudable aims of all hospitals. [See Blank v. Palo Alto-Stanford Hospital Center, 234 Cal. App.2d 377, 44 Cal. Rptr. 572 (1965), for a discourse on those aims.] After all, such contracts, as this one demonstrates, are extraordinarily lucrative and few applicants would hold out for post-contract staff privileges if by doing so the renewal of the exclusive contract would be forfeit. Alternatively, the Joint Commission must be persuaded to change its requirements.

PUNITIVE DAMAGES
Punitive damages are not viable in a breach of contract case. Griffith v. Shamrock Village, 94 So.2d 854, 858 (Fla. 1957). However, that need not concern us here because such damages were not sought in any of the breach of contract counts. The same is not true of the count on tortious interference with a business relationship and it is that aspect of the punitive damages awarded which governs our review.
As yet, we have not delineated sufficient facts to provide understanding about the business relationship allegedly interfered with in this case. Simply expressed, said interference consisted of hospital action designed to wean away the pathologist/plaintiff's following among the doctors, pursuant to his remaining staff privileges, but after the termination of his exclusive contract. The hospital also ultimately terminated those staff privileges, but while they remained, the hospital inconvenienced the plaintiff with such as withdrawal of an intrahospital telephone and failure to provide billing information. Why would the hospital follow such a course on which they admittedly embarked? The answer is, because after the termination of the pathologist/plaintiff's contract, it awarded a new exclusive pathology contract to a successor group and the plaintiff's continued medical presence was inevitably incompatible with the supposed successive exclusivity.
In order to sustain a punitive damages award in a tortious interference with a business relationship case, the two most important criteria are:
1. Whether the interference was justified. Bankers Multiple Line Insurance Co. v. Farish, 464 So.2d 530, 532 (Fla. 1985).
2. The nature, extent and enormity of the wrong. St. Regis Paper Co. v. Watson, 428 So.2d 243 (Fla. 1983).
As to the first of these criteria, Florida case law clearly holds that the question of whether or not an interference is justified is normally a jury question. In the case before us, the interrogatory verdict *562 presented to the jury was far from perfect and its question on the interference was framed as follows:
Did Hospital ... improperly and intentionally interfere with business relationships between [the pathologist] and the physicians at Doctors Hospital.
We are not at all sure that the word "improperly" is synonymous with "unjustifiedly." However, though the word used (improperly) may be error, it would appear harmless in view of two other questions to the jury asking if the hospital acted in bad faith. All three questions were answered in the affirmative and the sum of them inevitably supports the conclusion of unjustified interference.
There is nothing in the record that would appear to us to indicate that the hospital's behavior rose to the level of the "moral turpitude," "atrocity," "wantonness" and "outrageousness" required in the seminal case of Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 221 (1936). Indeed, were we to feel bound by Scheller, 462 So.2d 1 (Fla. 4th DCA 1984), we would have to conclude that the issue of punitive damages should not have gone to the jury at all. The facts in Scheller are very similar to those in the case now before us and in Scheller this very court opined that punitive damages were inappropriate as a matter of law. To support that conclusion, Scheller apparently depended on the fact that the tortious interference was "unsuccessful." No matter what we may think of that reasoning, we distinguish Scheller from the case at bar because there was evidence that the interference was successful in that the pathologist here finally had his staff privileges terminated. This did not occur in Scheller.
Despite Scheller and the extravagant quoted words from the seminal Archer case, we must heed the teachings of our Supreme Court and avoid substituting our judgment for that of the jury. A jury instruction on punitive damages was given in the instant case, though it bore little resemblance to the standard jury instruction recommended by the Supreme Court, and "the jury ... was well within its province to find ... justif[ication]... . The District Court['s] characterization of such conduct to the contrary was an evidentiary conclusion that invaded the province of the jury." Dunn v. Shaw, 303 So.2d 6, 7 (Fla. 1974); see also Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla. 1978); St. Regis Paper Co. v. Watson, 428 So.2d 243 (Fla. 1983).
Turning next to the second criterion, i.e., the nature, extent and enormity of the wrong, we are convinced that the jury was reversibly instructed on this aspect of the case. Compensatory damages in the sum of $450,000 were awarded. In addition, a whopping $5,500,000 (twelve times the compensatory figure) was assessed as exemplary damages. This latter sum was excessive when all the "circumstances attending the particular incident, as well as any mitigating circumstances" are examined. St. Regis Paper Co. v. Watson, 428 So.2d at 247. We next examine them.
Most importantly, the case went to the jury upon the predicate that the cancellation of the contract and the later termination of staff privileges had "killed [the plaintiff's] practice, [his] livelihood" and that his estimated otherwise remaining seven years of active practice had been taken from him. However, the jury was not informed that the trial court had reserved the right to grant an injunction reinstating staff privileges to the plaintiff, WHICH IN FACT THE COURT DID AFTER THE VERDICT. Meanwhile, the jury had conducted its deliberations upon the premise that the hospital had permanently banned the pathologist from practicing at the hospital, and as a practical matter anywhere else, for the remainder of his career  a totally incorrect assumption as subsequent events revealed. We are convinced that the enormity of the hospital's wrong, and most definitely the nature and extent of it, was substantially tempered by the grant of the injunction. It is true that the hospital should not get the credit for the restoration of privileges  that belongs to the trial judge. Nonetheless, a rose is a rose, the staff privileges were revived and, in our view, it was reversible error for the jury to *563 be kept in ignorance of this turn of events. In this context, we are impressed with this court's dicta in the factually similar Scheller case when it said:
Indeed, Dr. Scheller went to court in separate suits and obtained two injunctions to prevent the defendants from denying him access to test results and to the clinical laboratory facilities. Both of these injunctions were issued shortly before the main trial took place. The jury was not advised of the injunctions, but appellee has placed heavy reliance on the injunctions in argument before this court. No one has raised the question of how Dr. Scheller can get damages for future interference when that very interference has been twice enjoined by the court in suits between the same parties. Since this issue has not been raised, we do not further address it. (Emphasis in original)
462 So.2d at 9.
The pathologist argues that if the verdict and the injunction are incompatible, it is the latter that should be reversed. We reject this argument and parenthetically note that we have recognized the right to injunctive relief in a similar situation. See Palm Beach-Martin County v. Panaro, 431 So.2d 1023 (Fla. 4th DCA 1983).
There are also many mitigating circumstances attendant to this cause. It should be stressed that the hospital had every right to terminate the exclusive contract without cause and it was only its actions, at first hindering the exercise of the plaintiff's staff privileges, and later terminating them, which were available for jury scrutiny. Moreover, the hospital's interpretation as to the effect, or rather the lack of effect, on the by-laws because of the amendment, was not fanciful. There were inconsistencies between the terms of the contract and the amended by-laws, and in light of the hospital's avowed policy to continue exclusive contracts, albeit not with the plaintiff, it can hardly be classed as a villian for clinging to its preferred interpretation of the language employed. The squabble between the plaintiff and the hospital which led to his dismissal had, as its genesis, his insistence on levying fees for tests he did not supervise and which the hospital staff conducted, thus overcharging patients. Furthermore, the hospital's stance was certainly not legally arbitrary or capricious in the light of the Scheller opinion which was issued by this very court prior to trial. Finally, the evidence shows that the hospital's position that the pathologist/plaintiff did not qualify as a "medico/administrative" physician was not ridiculous, despite the court's ruling, to the contrary, as a matter of law. There was evidence that it was never intended that the plaintiff be affected by the amended by-laws even though the language employed in the amendment did include him.
The discourse in the immediately preceding paragraph about mitigating circumstances has a definite bearing on the punitive damages award in this cause. Specifically, in Bankers Multiple Line Insurance Co. v. Farish, the Supreme Court held that it was reversible error for the instructions, in a tortious interference case,[1] not to apprise the jury about the nature, extent and enormity of the wrong. Thus, while the Bankers court reaffirmed an earlier ruling that the punitive damage award need not bear any reasonable relationship to the compensatory damages, it also stressed that any instruction given must consider not only the net worth of the defendant, but also "the degree of wantonness or culpability" 464 So.2d at 533. Also see Arab Termite and Pest Control of Florida, Inc. v. Jenkins, 409 So.2d 1039 (Fla. 1982). We have examined the jury instructions in the case at bar and while we find that the jury was apprised about the right of the hospital to properly advance its own legitimate financial interest without being guilty of a tortious interference, it was never told to consider the hospital's degree of wantonness or culpability.
*564 Accordingly, the law of this state, as laid down by the Supreme Court, mandates a reversal of the award of exemplary damages and we remand with directions to grant a new trial on the issue of whether punitive damages should be imposed and, if so, the amount thereof.[2] As was said in St. Regis Paper Co. v. Watson, the award "must be proportionate to the magnitude of the wrong committed... . A defendant does have a right to be free from unreasonable punishment inflicted by an excessive punitive damages award." Id. at 248.
We find no merit as to any other point on appeal.
Recapitulating the consequences of our decision herein, we:
A. affirm the trial court's ruling that the amendment to the by-laws modified the exclusive contract,
B. uphold the legal basis for the presentation of the question of punitive damages to the jury,
C. reverse the punitive damage award because of (1) the failure to apprise the jury of the pending injunction, and (2) the failure to apprise the jury that it should consider the enormity of the wrong and the degree of wantonness in the light of mitigating circumstances, and,
D. affirm the award of compensatory damages without comment.
REVERSED AND REMANDED IN ACCORDANCE HEREWITH.
HERSEY, C.J., and GUNTHER, J., concur.

REHEARING GRANTED IN PART
LETTS, Judge.
We grant rehearing, but only as to the issue of punitive damages. That is not to say we vacate and hold for naught all that we said in the original opinion beneath the heading "PUNITIVE DAMAGES." Not only is there factual information contained therein, pertinent to what we now hold, but there is also discussion, for example, of the requirement that any jury instruction on punitive damages should consider the degree of wantonness or culpability of the defendant. However, while that discussion constituted a correct statement of the law, it is not relevant to that which we now hold.
In its initial brief, the appellant argued, by way of Porter v. Wilson, Walch, Fortner, Robinson and Besse, 384 So.2d 190 (Fla. 2d DCA 1980), that the trial court improperly allowed the jury to consider the issue of punitive damages. We were, of course, at that time, aware of the seminal case of Winn & Lovett Grocery Co. v. Archer, 126 Fla. 306, 171 So. 214, 222 (1936) stating:
The province of the court in all cases of claims for punitive ... damages is to decide at the close of the evidence, as a matter of law, the preliminary question whether or not there is any legal basis for recovery of such damages... . (emphasis supplied)
This threshhold requirement was emphatically repeated in Wackenhut Corp. v. Canty, 359 So.2d 430, 435 (Fla. 1978). Nevertheless, while we made it perfectly plain in our original opinion that we doubted if the facts in the case at bar would support an award of punitive damages, we did not hold that the question of punitive damages should not have gone to the jury. In retrospect, we believe we were in error.
There appears to be little doubt that the Florida Supreme Court has severely limited the availability of punitive damages in products liability cases and those involving employer negligence. Fisher v. Shenandoah General Construction Co., 498 So.2d 882 (Fla. 1986); American Cyanamid Co. v. Roy, 498 So.2d 859 (Fla. 1986); Wackenhut Corp. v. Canty; Chrysler Corp. v. Wolmer, 499 So.2d 823 (Fla. 1986). As we read these decisions, the culpable behavior required to "express society's collective outrage," American Cyanamid Co., 498 So.2d at 861, consists of "a reckless disregard *565 for human life equivalent to manslaughter" Chrysler Corp., 499 So.2d at 825. See also Celotex Corp. v. Pickett, 490 So.2d 35 (Fla. 1986). The difficulty we have in relating that standard to the case before us is that here we do not have a products liability, or employer negligence, case. What we have is a cause of action for intentional interference with an advantageous relationship. Obviously, intentional interference with a business relationship and culpable behavior tantamount to manslaughter are not synonymous. However, as the court noted in American Cyanamid Co. v. Roy, punitive damages are only tenable for "[t]ruly culpable behavior ... to express society's collective outrage... ." As the Supreme Court has also expressed it, in order to sustain a claim for punitive damages, the tort must be committed in "an outrageous manner or with fraud, malice, wantonness or oppression." Winn & Lovett Grocery Co. v. Archer.
As we see it, the hospital, sub judice, was not activated to do what it did out of malice; in fact it had a legitimate objective in view. See Landry v. Hornstein, 462 So.2d 844 (Fla. 3d DCA 1985). No fraud is alleged and the methods employed do not appear to have been sufficiently outrageous to reach the level of wantonness that would activate society's collective outrage. As we said in the original opinion:
There are also many mitigating circumstances attendant to this cause. It should be stressed that the hospital had every right to terminate the exclusive contract without cause and it was only its actions, at first hindering the exercise of the plaintiff's staff privileges, and later terminating them, which were available for jury scrutiny. Moreover, the hospital's interpretation as to the effect, or rather the lack of effect, on the by-laws because of the amendment, was not fanciful. There were inconsistencies between the terms of the contract and the amended by-laws, and in light of the hospital's avowed policy to continue exclusive contracts, albeit not with the plaintiff, it can hardly be classed as a villain for clinging to its preferred interpretation of the language employed. .. . Furthermore, the hospital's stance was certainly not legally arbitrary or capricious in the light of the Scheller opinion which was issued by this very court prior to trial. Finally, the evidence shows that the hospital's position that the pathologist/plaintiff did not qualify as a "medico/administrative" physician was not ridiculous, despite the court's ruling, to the contrary, as a matter of law. There was evidence that it was never intended that the plaintiff be affected by the amended by-laws even though the language employed in the amendment did include him.[1]
Accordingly, in the light of our Supreme Court's pronouncements and upon reexamination of the record of this case, we now conclude as a matter of law that there is no legal basis for the recovery of punitive damages, that the issue should not have gone to the jury, and that a directed verdict in favor of the hospital should have been entered. As a consequence, we reverse the award of punitive damages and remand this case for the entry of a judgment in accordance herewith.
In all other respects, our original opinion issued September 17, 1986, is affirmed.
HERSEY, C.J., and GUNTHER, J., concur.
NOTES
[1] Bankers was a tortious interference with a contract case. While the one before us now, concerns a tortious interference with a business relationship. The principle, however, is identical.
[2] We note that even though a punitive damages instruction is given "a plaintiff has no right to punitive damages." It is for the jury to determine whether to award same. St. Regis Paper Co. v. Watson, 428 So.2d 243.
[1] The plaintiff also directs our attention to alleged contempt of court actions by the hospital. However, we can find no orders in the record holding the hospital in contempt.