619 So.2d 298 (1992)
John W. HARLLEE and ATEC Associates, Inc., Appellants/Cross-Appellees,
v.
PROFESSIONAL SERVICE INDUSTRIES, INC., Appellee/Cross-Appellant.
No. 89-2650.
District Court of Appeal of Florida, Third District.
December 1, 1992.
As Amended on Denial of Rehearing, Rehearing and Certification June 8, 1993.
Fowler, White, Burnett, Hurley, Banick & Strickroot and Ronald J. Marlowe, for appellants.
Goldstein & Tanen, and Susan E. Trench, for appellee.
Before COPE, LEVY and GERSTEN, JJ.
As Amended on Denial of Rehearing, Rehearing En Banc and Certification June 8, 1993.

ON REHEARING GRANTED
PER CURIAM.
We grant the appellants' motion for rehearing, withdraw this court's prior opinion, and substitute the following opinion.
John W. Harllee and ATEC Associates, Inc., appeal a final judgment entered against them for tortious interference with business and contractual relationships. Professional Service Industries, Inc., cross-appeals *299 denial of its claim for punitive damages. We reverse as to the main appeal and affirm as to the cross-appeal.
For 36 years, Harllee worked for a firm known as Pittsburgh Testing Laboratory ("PTL"), which was in the business of providing engineering and scientific testing services for private and governmental entities. Harllee was regional vice president for the Florida operations of PTL.
In January, 1987 PSI acquired PTL. PTL was merged into PSI, so that PSI was the surviving entity.
According to the trial court's findings of fact:
In April, 1987, a meeting of officers and key personnel of Plaintiff, PSI, was held in Dallas, Texas, to discuss the merger of PTL and PSI and change of corporate policies resulting from the merger.
At the Dallas meeting, three important changes, affecting employees, were announced by the new owners: (1) abolition of the existing defined benefit pension plan, (2) reduction of sick leave days, and (3) elimination of employer paid health insurance coverage for dependents. After these changes were brought to the attention of Plaintiff's personnel, employee discontent and dissatisfaction developed in all of the Florida offices of Plaintiff.

(R. 573) (emphasis added).
Not surprisingly, the employees began to question what sort of future lay ahead for them with PSI. At the end of May, 1987, Harllee agreed to open a Florida office for ATEC, a company which was a competitor of PSI but did not have a Florida presence.
During early June, 1987, word leaked out that ATEC was about to open operations in Florida. In mid-June, codefendants Steven Anderson and Bennett E. Laughlin left PSI and opened offices for ATEC. At the end of June, Harllee gave two weeks notice. In response, PSI fired him immediately. Harllee then began work for ATEC.
During June, 57 employees gave notice. These were for various departure dates extending into mid-July, 1987. PSI management made efforts to persuade the resigning employees not to leave, but those efforts were unsuccessful. The resigning employees joined ATEC.
PSI responded with a suit against Harllee, three coworkers (Michael H. Straube, Steven Anderson, and Bennett E. Laughlin), and ATEC for the following:
I. Tortious interference with business relationships.
II. Tortious interference with contractual relationships.[1]
III. Breach of fiduciary duty.
IV. Conversion.
V. Civil theft.
According to the trial court:
Counts I and II allege, in substance, that Defendants John W. Harllee, Michael H. Straube, Steven Anderson and Bennett E. Laughlin (hereinafter referred to as Harllee, Straube, Anderson and Laughlin), individually and on behalf of Defendant Atec Associates, Inc. (hereinafter referred to as ATEC), solicited Plaintiff's customers and employees while still in Plaintiff's employ.
Count III alleges Defendants Harllee, Straube, Anderson and Laughlin solicited Plaintiff's customers for their own business while in Plaintiff's employ.
Counts IV and V allege conversion and civil theft by the individual Defendants of Plaintiff's customer files, customer lists, client files, and other personal property, including tools and equipment.
After bench trial, the court found against Harllee and ATEC on counts I and II only. Harllee's coworkers were exonerated on all counts, and Harllee and ATEC were exonerated on counts III, IV, and V. Judgment was entered against Harllee and ATEC on counts I and II, and they have appealed.
The elements of tortious interference with a business relationship are:
(1) The existence of a business relationship, not necessarily evidenced by an enforceable contract;

*300 (2) knowledge of the relationship on the part of the defendant;
(3) an intentional and unjustified interference with the relationship by the defendant; and
(4) damage to the plaintiff as a result of the breach of the relationship.
Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla. 1985).
The tort law does not, however, create a general immunity from competition. Instead, "it is only direct and unjustified interference that is actionable." Perez v. Rivero, 534 So.2d 914, 916 (Fla. 3d DCA 1988) (citation omitted).
A former employee is free to compete against a former employer (absent a noncompetition agreement to the contrary).[2]Renpak, Inc. v. Oppenheimer, 104 So.2d 642, 645 (Fla. 2d DCA 1958). It is also settled that "an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment." Fish v. Adams, 401 So.2d 843, 845 (Fla. 5th DCA 1981).
Harllee and ATEC contend that the trial court misapprehended the controlling legal principles and that there is an absence of substantial competent evidence to support the judgment. We agree.
In counts I and II, PSI claimed that Harllee solicited PSI's customers and employees before Harllee left PSI. This boils down to consideration of the 30-day period between Harllee's reaching agreement with ATEC on May 29 and his actual departure on June 29.
The trial court made the following specific finding:
While there is no direct evidence that Harllee, during his employment with Plaintiff, actively solicited Plaintiff's customers or his co-employees to work for ATEC, Harllee's other actions on behalf of ATEC were further evidence of his breach of loyalty to Plaintiff: While still in Plaintiff's employ, Harllee opened a bank account in Jacksonville and orchestrated the acquisition of office space and telephone listings and services for ATEC.
In other words, the court expressly found that Harllee had not solicited employees or customers. The court concluded, however, that liability could be imposed for the actions identified in the second sentence: opening a bank account and acquiring office space and telephones. The court reasoned that these steps (as well as the entire idea of opening a Florida office for ATEC) were disloyal and therefore actionable.
As Fish v. Adams, explains, however, mere preparation to open a competing business does not violate the employee's duty of loyalty and does not constitute tortious interference. 401 So.2d at 845. Opening a bank account and obtaining office space and telephone service are acts of mere preparation and do not constitute intentional interference with a business relationship.[3]
The trial court also ascribed to Harllee a subjective intent that PSI's "employees quit as a group and go to work for ATEC immediately, en masse." Findings in Nonjury Trial, at R. 576. As a preliminary matter, the evidence does not support the implication that the employees simultaneously resigned or walked out en masse. As already stated, the employees left at varying dates in June and July, after giving customary notice. After Harllee's discharge, PSI management tried to persuade the employees to remain with PSI but the employees declined to do so.
In any event, Harllee's subjective state of mind  his hope or desire that PSI employees join ATEC  is not actionable. Several of Harllee's co-employees had already resigned to open the ATEC office. Harllee may have hoped that others would join ATEC, but as long as he refrained from impermissible solicitation  and the court *301 found that Harllee did not engage in solicitation of customers or employees  then there is no basis for liability.
PSI relies heavily on evidence said to constitute an illegal solicitation of PSI customer Gordon Smith, which consisted of a conversation and letter to Smith from Michael H. Straube, a former PSI manager. Straube was a defendant in the lawsuit and the trial judge entered judgment in Straube's favor.[4]
The reason the trial judge exonerated Straube is because the conversation did not occur, and the letter was not sent, until after Straube left PSI's employ. At trial Gordon Smith testified that he was not certain when Straube had spoken with him and acknowledged that Straube may have already departed PSI at the time the conversation took place. Straube testified unequivocally that the conversation took place after he left PSI. Similarly, the uncontroverted testimony regarding the solicitation letter was that although the letter was dated June 29, 1987, Straube did not actually send it, nor did Gordon Smith receive it, until after Straube left PSI. Straube and Smith both agreed on this. It was, of course, permissible for Straube to contact Gordon Smith after he left PSI.
Obviously the trial judge believed Straube, because he entered judgment in Straube's favor on the tortious interference claims. Since Straube was exonerated with respect to both the conversation and the letter, the same conversation and the same letter cannot be used to impose liability on Harllee and ATEC. Even if that were not so, there is no finding of any involvement by Harllee or ATEC in the conversation with, or the letter to, Gordon Smith.
PSI argues that the judgment should be affirmed on the basis that defendants stole trade secrets. Those allegations were not part of counts I and II but were part of counts IV and V, for conversion and civil theft. The trial court entered judgment in favor of defendants on those counts, and PSI has not cross-appealed. For present purposes, therefore, there was no misappropriation of trade secrets and such allegations cannot be used to sustain the judgment.
In order to impose liability on Harllee and thereby on ATEC, there must be findings of fact, supported by substantial competent evidence in the record, which show that Harllee and ATEC engaged in actionable misconduct. In the present case the trial court misapprehended the legal standard. The acts of Harllee did not constitute tortious interference with a business relationship.
As to the main appeal, the judgment is reversed and the cause remanded with directions to enter judgment for defendants. As to the cross-appeal, the judgment is affirmed.
Reversed and remanded as to main appeal; affirmed as to cross-appeal.
COPE and LEVY, JJ., concur.
GERSTEN, Judge.
I respectfully dissent.
Appellants/Cross-appellees, John W. Harllee (Harllee) and ATEC Associates, Inc. (ATEC), appeal from a final judgment holding them liable for tortiously interfering with the business and contractual relationships of Appellee/Cross-appellant, Professional Service Industries, Inc. (PSI). PSI appeals the denial of its claim for punitive damages.
Harllee was employed by PSI for thirty-six years. At the time immediately prior to the events underlying this litigation, Harllee held the position of regional vice-president for PSI in charge of all its Florida offices. As part of his duties, Harllee had total responsibility for the Florida operations, including work solicitation and performance, client contact, and personnel.
In January 1987, PSI merged with another company and underwent an organizational restructuring. Harllee was not *302 pleased with the changes in policy and organization brought about by the merger.
After an April 1987, meeting where PSI had explained the changes, Harllee contacted ATEC. ATEC engaged in the same line of services as PSI, but had no offices in Florida. On May 22, 1987, Harllee presented ATEC with a "Florida Development Plan."
The plan prepared by Harllee outlined how he proposed to undertake the setting up of ATEC offices in Florida. This development plan included an organizational chart reflecting the change-over of PSI employees to ATEC. The organizational chart included not only Harllee and other top PSI managers, but also a list of other PSI employees necessary to run the new ATEC offices. The list included the name and salary of each PSI employee. All of the employees listed in the plan ultimately left PSI and went to ATEC.
In addition to personnel, the plan listed the facilities and equipment needed, detailed financial projections, and a summary of how ATEC offices were to begin their operations on July 1, 1987. ATEC approved the plan and Harllee set it into motion. Harllee rented offices, set up bank accounts, recruited employees, and prepared the ATEC offices for their July opening date.
As part of the change-over taking place, without any knowledge by PSI, Harllee and the other PSI employees contacted PSI customers and advised them that they were leaving PSI and going to ATEC. One manager still in the employ of PSI, advised a PSI customer that the PSI employees working on his projects would be leaving PSI, "and, therefore, [PSI] is not in a position to continue providing the inspection services which you had contracted with them. I am in a position to continue the team intact." In a subsequent letter, dated June 29, 1987, and representative of the tone and manner of these client contacts, the same manager informed the customer:
The principals as well as many of the former [PSI] staff from the Miami, West Palm Beach and Jacksonville offices will be transferring their employment to [ATEC].
These events will effect [sic] the ability of [PSI] to conduct your required ... inspections... .
[ATEC] will be in a position to offer uninterrupted service with the same individuals now working on your projects, at the same fee structure. I would recommend the change over to ATEC should take place effective July 6, 1987 for both the Solo Project and the 625 Madison Avenue Project.
During the month of June, the employees leaving PSI presented Harllee with letters of resignation. Harllee did not advise PSI until the end of June of these resignations. On June 29, 1987, Harllee submitted his own resignation. At that time, fifty-seven other employees had already resigned and were transferring to ATEC.
In anticipation of their move, Harllee and the other PSI employees not only recruited PSI clients, but also copied PSI materials, customer lists, forms, and documents. Manuals, tools, equipment, and contract files necessary for providing the client services were taken by the transferring employees at the direction of the managers. Harllee and the PSI employees also stopped recruiting new customers and bidding on new projects for PSI.
The result of the mass walkout, the removal of PSI information to ATEC, the solicitation of PSI's clients, as well as the deletion of information from PSI's computers and files, made it impossible for PSI to continue the work on its ongoing projects. PSI lost its major customers to ATEC. Harllee also applied for and received a contract for ATEC, which PSI had previously held and which Harllee had allowed to expire without a reapplication being made.
PSI brought this action seeking to recover lost past and future profits and punitive damages. The trial court awarded PSI $900,000 in lost profits, but held that the evidence fell "short of the proof to sustain a claim for punitive damages." The trial court then denied PSI punitive damages.
Since 1887, the rule in Florida has been that interference with any contract *303 amounts to a tort. See Chipley v. Atkinson, 23 Fla. 206, 1 So. 934 (1887). However, even that decision was not a novel concept, finding its basis on the reasoning of English common law-precedent. See Lumley v. Gye, 2 El. & Bl. 216 (Q.B. 1853). In Lumley, a theater owner brought an action against a third party who induced an actress to break her contract to sing at the plaintiff's theater. The court held that an action would lie for the malicious procurement of a breach of contract.
Those opinions serve as the basis for modern day authorities which hold that an injured party has an action against a third-party wrongdoer who interferes in contractual relationships. See, e.g., Dade Enterprises, Inc. v. Wometco Theatres, Inc., 119 Fla. 70, 160 So. 209 (1935).
More recently, the Florida Supreme Court recognized the elements needed to show a prima facie case of tortious interference with a business relationship are:
(1) The existence of a business relationship, not necessarily evidenced by an enforceable contract;
(2) knowledge of the relationship on the part of the defendant;
(3) an intentional and unjustified interference with the relationship by the defendant; and
(4) damage to the plaintiff as a result of the breach of the relationship.
Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla. 1985). In Tamiami, the court also held that the action is tortious, regardless of motive. Tamiami, 463 So.2d at 1128. The record supports a finding that each of those elements were shown to have been present. The record also shows that ATEC and Harllee intentionally interfered with PSI's business and contractual relationships. The final judgment finding Harllee and ATEC liable is therefore correct.
At trial, PSI presented evidence of its actual damages, including lost profits. There is sufficient evidence to support the amount awarded PSI.
PSI cross-appealed as to punitive damages. In order to sustain an award for punitive damages in a tortious interference action, two criteria must be met: (1) whether the interference was justified; and, (2) the nature, extent, and enormity of the wrong. Hospital Corporation of Lake Worth v. Romaguera, 511 So.2d 559 (Fla. 4th DCA 1986), review dismissed, 518 So.2d 1275 (Fla. 1987).
Since appellants' interference was unjustified, the focus shifts to the second criteria: the nature, extent and enormity of the wrong. In the seminal case of Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214 (1936), the Florida Supreme Court held that punitive damages are assessable "dependent on the circumstances showing moral turpitude or atrocity" or an injury "that is wanton and malicious or gross and outrageous." Winn & Lovett Grocery Co., 126 Fla. at 327, 171 So. at 221. Subsequent case law has continued to require such gross conduct or injury in order to award punitive damages. See Hospital Corporation of Lake Worth, 511 So.2d at 562.
Appellants' behavior, or the wrong they inflicted, does not rise to such levels, and therefore, the trial court's denial of punitive damages is proper. Accordingly, I would affirm the final judgment, awarding PSI $900,000 in compensatory damages and denying punitive damages, in its entirety.
On rehearing, appellants make much of the fact that among its findings the trial court stated:
There is no direct evidence that HARLLEE, during his employment with Plaintiff, actively solicited Plaintiff's customers or his co-employees to work for ATEC.
Appellants contend, and the majority accepts, that this means there was no evidence to support that contention. In fact, what it means is just what is says, that there is no direct evidence. There is, however, plenty of indirect evidence, to support a claim of tortious interference with business relationships, and tortious interference with contractual relationships, found by the trial court and evidenced by the record on appeal.
*304 A few of these examples, in addition to those previously quoted, are:

A.

DADE COUNTY SCHOOL BOARD
A July 15, 1987, letter from Harllee to PSI client, Dade County School Board:
Prior to my resignation ... and subsequent to my resignation, numerous other employees of that firm have terminated their employment there and accepted employment with a number of other firms. As of the close of business this date, all of the professional engineers and graduate engineers, geologists, and chemists who were employed by PTL ... at the time selection proceedings were in progress for your new engineering services agreement, are no longer employed by that firm. Perhaps Dade County Public Schools, should consider cancelling the present selection proceedings and start the process over again. The decisions made during the selection process were based on the qualifications and experience of the professional engineering, support engineering, and technical staff then employed, who are now no longer associated with PTL ...
Harllee had negotiated the contract between PSI and the School Board for a number of years. Harllee knew that the School Board's contracts are based on bids. The bids take into account not only the dollar amount but also the qualifications of the company's employees who would perform the work. The result is that a contract may be awarded to a higher bid, if the qualifications of the staff were better.
In his letter to the School Board, Harllee argues that they should cancel the previously negotiated contract between the School Board and PSI because the employees (upon whose qualifications they based their contract) were no longer working for PSI.
The School Board decided to follow Harllee's recommendations, prompting the following reply from PSI:
This letter will confirm our conversation ... regarding the contract the school board had with PTL... As I explained to you, the contacts Mr. Harllee made with the school board, first advising them to hold up the contracts after they were signed, then advising them to invalidate the contracts, were made without our authority. It is apparent that Mr. Harllee was working for his own benefit and to the detriment of our company when he made these "recommendations"... . As you told me, however, you have recommended that the school board re-interview the applicant companies and make a decision as to the engineering firm to be engaged. You also told me that the evidence upon which you were basing your recommendation was the correspondence Mr. Harllee sent you... . We urge you to reconsider your position and ... reinstate the contract for services for PTL... .
The School Board gave the contract to another company.
This letter from PSI to the School Board negotiator purports to confirm telephonic conversations where the School Board told PSI about Harllee's efforts at cancelling the contract. In fact, the School Board followed Harllee's recommendations, and gave the contract to a company with a lower rating than PSI.

B.

GENERAL DEVELOPMENT CORPORATION
Harllee wrote to another PSI client, General Development Corporation (GDC), on July 6, 1987:
Services would be provided by the same engineers and experienced technicians who have worked on these General Development projects for up to the past thirty years.
GDC had a number of ongoing contracts with PSI. For 30 years, PSI had provided GDC with engineers on most of its construction projects. In this letter (there are several other similar letters to different GDC project managers), Harllee makes it a point to tell GDC that he would provide the services previously provided by PSI, with *305 the "same" employees that had worked in GDC projects for 30 years.
Harllee resigned his employment with PSI on June 29, 1987, to be effective June 30, 1987. However, prior to his formal resignation, he engaged in conduct which effectively shows his lack of loyalty to PSI, and his intentions to deceive PSI while setting up ATEC and recruiting PSI's employees:
(a) Harllee prepared a development plan for ATEC on May 22, 1987, which included a list of PSI employees to change over to ATEC. (These employees did leave PSI to work for Harllee at ATEC.)
(b) Harllee received a letter from ATEC dated May 29, 1987:
Both Jerry and I appreciate the long day you put in to visit with us recently in Atlanta and Indianapolis. The meetings were productive and the development plan booklet which you presented to us was informative and showed considerable thought.
... .
A plan should be developed to decide: (a) if one or more key team members should resign now to implement the plan and solicit work (with others waiting 30 or so days); (b) if all initial staff should resign at one time 30 or so days from now, or; (c) some other approach.
This letter confirms the plan to deceive PSI by having the employees either resign all at once, or in stages. The fact that the employees were recruited and leaving was an obvious forgone conclusion.
(c) Harllee received and accepted the resignations of PSI employees, while duplicitously telling PSI that he was attempting to dissuade the employees from leaving. At the same time, prior to the employee's resignation, Harllee had applied for ATEC licenses and bank accounts for ATEC (with these same employees being co-signators):
(1) Even though Harllee told PSI that Harllee "asked him [Anderson] to think this over before making this decision," (on Payroll Separation Report for Stephen G. Anderson with a last day worked of June 30, 1987) Harllee was associating with Anderson under ATEC as of June 25, 1987, (Certificate of Florida State Board of Professional Engineers dated June 25, 1987). By a letter dated June 16, 1987, Stephen G. Anderson accepted employment with ATEC;
(2) Harllee "accepted" Benton Laughlin's resignation, effective June 26, 1987, even though there is a signature card from Southeast Bank dated June 19, 1987, for the ATEC account on which Laughlin was a co-signator with Harllee, as district manager of ATEC;
(3) Harllee "accepted" Derenda Foster's resignation, effective June 29, 1987, even though there is a signature card from Southeast Bank dated June 19, 1987, for the ATEC account on which Foster was a co-signator with Harllee, as office manager of ATEC.
PSI contended that Harllee did not submit these resignations to the company until he submitted his own. Leaving PSI with no opportunity to attempt to dissuade these employees. In other words, when Harllee submitted his resignation, ATEC was a done deal with PSI employees and clients.
Until June 30, 1987, while still in PSI's employ, and supposedly loyal to PSI, Harllee:
(d) allowed Mike Straube, his employee at PSI and future manager at ATEC, to order telephones for ATEC on June 4, 1987, using PSI's number as the contact number.
(e) had his name included in ATEC's application for radioactive materials licenses dated June 19, 1987, (together with Stephen Anderson and Benton Laughlin).
(f) filed a Certificate of Authorization Application Form received by the Department of Professional Regulation on June 25, 1987, listing his association with ATEC (together with Stephen Anderson and Jesus Rodriguez, another PSI employee).
All these documents plainly show Harllee's clear and successful attempts to tortiously interfere with PSI's business and contractual relationships. Accordingly, I would also deny the motion for rehearing.
NOTES
[1] For present purposes counts I and II will be treated interchangeably. See Smith v. Ocean State Bank, 335 So.2d 641, 642 (Fla. 1st DCA 1976).
[2] There were no employment contracts in the present case.
[3] The theory of counts I and II was active solicitation of employees and customers. The described acts do not constitute solicitation.
[4] In early July Straube was fired by PSI when he refused to sign an employment contract. Straube then joined ATEC.