DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SERITAGE SRC FINANCE, LLC,**
Appellant,

v.

**THE TOWN CENTER AT BOCA RATON TRUST,**
Appellee.

No. 4D2023-0982

[September 18, 2024]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Samantha Schosberg Feuer, Judge; L.T. Case No. 502019CA014037XXXX.

Glenn E. Goldstein, Avi Benayoun, and Brigid Cech Samole of Greenberg Traurig, P.A., Fort Lauderdale, and Hala Sandridge of Buchanan Ingersoll & Rooney PC, Tampa, for appellant.

Mitchell W. Berger, Nicole Levy Kushner, and Brittany N. Husk of Berger Singerman LLP, Fort Lauderdale, for appellee.

GROSS, J.

This is an appeal of a final judgment of specific performance arising out of a provision in an extensive easement agreement between sophisticated business entities. We affirm the final judgment.

Running hundreds of pages with attachments, the agreement arose out of the expansion of a regional shopping mall in Boca Raton. The agreement's salient provision provides that if certain property attached to the mall "is to be used for non-retail purposes," the developer (i.e., appellee[1]) shall have the option to trigger a buyout process by requesting an appraisal of the property's fair market value.

On cross-motions for summary judgment, the circuit court interpreted the meaning of "retail" and "to be used." The court interpreted "retail" consistent with its plain meaning and concluded that, as used in the

---

[1] Appellee is the successor in interest to the developer.

agreement, the term did "not include the proposed restaurants, entertainment services, and/or fitness clubs" that appellant proposed to develop. The court interpreted "to be used" as "refer[ing] to anticipatory use, rather than a prior or active use." The court concluded that such anticipatory use was "satisfied by [appellant's] repeated, clear, and progressive steps taken to redevelop the Sears Site." The court granted appellee's motion for summary judgment and entered the final judgment on appeal.

Our review of an order granting summary judgment is de novo. *City of Delray Beach v. DeLeonibus*, 379 So. 3d 1177, 1180 (Fla. 4th DCA 2024). Likewise, we review a trial court's interpretation of a contract de novo, so long as "the language is clear and unambiguous and free of conflicting inferences." *N. Star Beauty Salon, Inc. v. Artzt*, 821 So. 2d 356, 358 (Fla. 4th DCA 2002). "Whether an ambiguity exists in a contract is a question of law subject to a de novo standard of review." *Torwest, Inc. v. Killilea*, 942 So. 2d 1019, 1020 (Fla. 4th DCA 2006).

"When the language of a contract is clear and unambiguous, courts must give effect to the contract as written and cannot engage in interpretation or construction as the plain language is the best evidence of the parties' intent." *Talbott v. First Bank Fla., FSB*, 59 So. 3d 243, 245 (Fla. 4th DCA 2011). "All contracts must be given a reasonable interpretation according to the intention of the parties *at the time of executing them*[.]" *Holmes v. Kilgore*, 103 So. 825, 827 (Fla. 1925) (emphasis added). A court must interpret a contract "in a manner that accords with reason and probability," endeavoring to "avoid an absurd construction." *Katz v. Katz*, 666 So. 2d 1025, 1028 (Fla. 4th DCA 1996).

We have explained that "contractual language is ambiguous only if it is susceptible to more than one *reasonable* interpretation." *BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012). "A true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible." *Am. Med. Int'l Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. 4th DCA 1984). In short, "where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner." *Delsordo*, 127 So. 3d at 530.

We affirm the trial court's final judgment and interpretation of the agreement's terms. The trial court interpreted the agreement in the rational manner and properly rejected the appellant's strained interpretation. The agreement is not ambiguous. Executed in 1985, the

2

agreement was between the mall developer and some of the dominant retailers of the day, such as Federated Department Stores,[2] Sears, Roebuck & Co.,[3] Saks & Company, and Associated Dry Goods Corporation.[4] As used throughout the agreement, the term "retail" describes the business in which these "retailers" were involved. For example, one purpose of the agreement was to allow the mall to operate as a regional shopping center and expansion "as an integrated group of retail stores"; the agreement required the developer with governmental permits and approvals to permit the expansion "for the sale, of goods, wares and merchandise at retail."

We agree with the trial court that "to be used" contemplates anticipatory use. As appellee argues, the interpretation of "to be used" proposed by appellant would lead to an absurd result—the buyout process would not be triggered until after the Sears site "was demolished, redeveloped, and used for non-retail purposes." As appellee points out, such a view would destroy the "integrated harmonious use of the Sears" site contemplated by the agreement and would result in waste.

For these reasons, we affirm the final summary judgment.

*Affirmed.*

KLINGENSMITH, C.J., concurs.
FORST, J., dissents with opinion.

FORST, J., dissenting.

The majority opinion determines that the agreement at issue in this case "is not ambiguous" and that "the interpretation of 'to be used' proposed by [A]ppellant would lead to an absurd result—the buyout process would not be triggered until after the Sears site 'was demolished, redeveloped, and used for non-retail purposes.'" As discussed herein, I disagree on both points. Accordingly, I respectfully dissent.

**Background**

---

[2] Federated was the owner of parcels designated for Burdines and Bloomingdales.

[3] Appellant is the successor in interest to Sears, having acquired its interest in the property from the bankruptcy proceeding.

[4] Associated owned Lord & Taylor.

In 1985, Sears, as predecessor in interest to Appellant Seritage, and Town Center Investment Associates, as predecessor in interest to Appellee Town Center, along with other parties, executed an agreement—"Town Center at Boca Raton First Amended and Restated Reciprocal Easement Agreement" ("REA")—which governs the rights and obligations of the owners of these parcels. In 2015, Appellant acquired Sears store locations across the United States. Appellee is a trust and wholly owned subsidiary of Simon Property Group and owns the Town Center Mall in the City of Boca Raton. Appellant owns the former Sears store parcel, adjacent to the mall.

The REA's section 11.3 is the focus of the dispute before us. That provision states, in pertinent part:

> [I]n the event that any of the Sears Site . . . **is to be used** for non-retail purposes during the Term of this Agreement, Sears . . . shall so notify Developer and Developer shall have the option at any time within thirty (30) days after the expiration of six (6) months from the date of notice of such cessation to request an appraisal of the fair market value of such Site . . . . Upon receipt of such notice of election, Developer shall promptly designate a qualified appraiser . . . . Developer shall have the right, to be exercised at any time within sixty (60) days following receipt of written notice from the board of appraisers of any appraisal made in accordance with this Section 11.3, to elect to purchase such Site . . . .

(Emphasis added).

The REA's notice obligations are set forth in section 11.11:

> Any notice, request, demand, approval or consent given or required to be given under this Agreement shall, except as otherwise expressly provided herein, be in writing, shall be delivered by registered or certified mail, postage prepaid, by courier, by messenger or by personal delivery, and shall be deemed to have been given when received by the other parties at the addresses stated below or at the last changed address given by the party to be notified as hereinafter specified[.]

In 2016–18, Appellant and Appellee engaged in discussions regarding Appellant's Boca Raton Sears site. These discussions included developing the site as a joint venture for a mixture of retail, residential, restaurant, and entertainment uses. Appellee never indicated that the exchange of

plans as to how to develop the Sears site as a joint venture constituted section 11.3 notification. After Appellee rejected a proposal to develop the Sears site as a joint venture, Appellant moved ahead in exploring development on its own, while keeping Appellee informed of potential plans.

To that end, in November 2018, an Appellant representative sent a short email to an Appellee representative attaching a "conceptual plan for our call [later that day]." An Appellee executive later characterized the call as "purely informational." Further meetings between the parties followed with respect to redevelopment plans concerning Appellant-owned properties adjacent to Appellee-owned properties, including the site at issue here. Nonetheless, Appellee informed Appellant that the November 2018 email constituted section 11.3 formal "notice," triggering Appellee's contractual right "to request an appraisal of the fair market value of such [s]ite" with the option to purchase at that price. When Appellant objected, Appellee sued seeking specific performance.

Below, Appellee contended Appellant had placed Appellee on notice of Appellant's determination that the property "is to be used" for non-retail development. Appellant disputed this characterization, noting any development required local governmental approval and that the Boca Raton planning and zoning board had rejected Appellant's proposal for mixed-use development of the Sears site.[5]

Both parties sought summary judgment. Appellee argued: (1) Appellant had given Appellee actual notice of its intent for the site to be used for non-retail purposes; (2) Appellant had breached its obligation by failing to notify Appellee of its plans to redevelop the site for non-retail purposes; and (3) Appellee had properly and timely exercised its right to an appraisal. By claiming Appellant gave it notice that the Sears site "is to be used for non-retail purposes," Appellee sought to have the site appraised and then ultimately purchase the site for the appraisal value.

Appellant's cross-motion for summary judgment maintained the phrase "is to be used" refers to an absolute and unequivocal outcome, and because Appellant had not received any necessary government approvals for redevelopment, nor had Appellant committed to using the property for non-retail purposes, it is impossible to know what the site's ultimate use would have been.

---

[5] Appellant did not appeal this decision to the City Council.

After a hearing on the motions, the trial court granted Appellee's motion for final summary judgment and denied Appellant's motion. The court held in pertinent part:

- The court must determine (i) what constitutes "non-retail purposes," (ii) the meaning of "is to be used," and (iii) the form of notice required to trigger Appellee's purchase option rights;
- After examining caselaw providing "limited instruction regarding this disputed contractual language," the court concluded that the phrase *is to be used* "refers to anticipatory use, rather than a prior or active use";
- Appellant "began to solidify an intent to redevelop the Sears [s]ite" based on "ever-increasing discussions and application submissions" and the language "is to be used" was satisfied by Appellant's "repeated, clear, and progressive steps taken to redevelop the Sears site"; and
- Appellant gave Appellee notice when Appellant hand-delivered redevelopment plans to Appellee and submitted redevelopment plans to the City, thus serving Appellee with direct knowledge of Appellant's intention to redevelop the site for a non-retail purpose.

This appeal follows.

## Analysis

As noted in the majority opinion, we review orders granting summary judgment de novo. *Serrano v. Dickinson*, 363 So. 3d 162, 165 (Fla. 4th DCA 2023). The new summary judgment rule prohibits summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *In re Amends. to Fla. R. Civ. P. 1.510*, 317 So. 3d 72, 75 (Fla. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Nonetheless, "the general rule remains intact: credibility determinations and weighing the evidence 'are jury functions, not those of a judge,' when ruling on a motion for summary judgment." *Daniel's Tree Serv., Inc. v. Nat'l Core Servs. Corp.*, 379 So. 3d 524, 530–31 (Fla. 4th DCA 2023) (quoting *Gracia v. Sec. First Ins. Co.*, 347 So. 3d 479, 482 (Fla. 5th DCA 2022)).

**Appellant's Interpretation of "is to be used" was No Less Reasonable than Appellee's Interpretation (a Reasonable Jury *Could* Return a Verdict for Appellant)**

We have previously acknowledged "the paradox of each side claiming that the contract is clear and unambiguous, but each side ascribes a different meaning to the 'unambiguous' language of the contract . . . ." *Miller v. Kase*, 789 So. 2d 1095, 1098 (Fla. 4th DCA 2001). This is the situation here. Arguably, the REA is susceptible to more than one reasonable interpretation, in which case it would be ambiguous. *See BKD Twenty-One Mgmt. Co. v. Delsordo*, 127 So. 3d 527, 530 (Fla. 4th DCA 2012). "In cases where a contract is ambiguous, summary judgment is usually improper." *Nationstar Mortg. Co. v. Levine*, 216 So. 3d 711, 714 (Fla. 4th DCA 2017). Here, at a minimum, the provision at issue is ambiguous. "The very fact that both parties interpreted the [provision] to mean radically different things is an indication that this matter was not appropriate for summary judgment." *Soncoast Cmty. Church of Boca Raton, Inc. v. Travis Boating Ctr. of Fla., Inc.*, 981 So. 2d 654, 656 (Fla. 4th DCA 2008).

Context matters. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("Of course, words are given meaning by their context . . . ."). The Sears store was an anchor of the Town Center Mall when the REA was entered. Appellee's predecessor in interest wanted to ensure that if Sears or its successor chose a non-retail property use, Town Center and its successors would have the first option to purchase the site for fair market value.

Per sections 11.3 and 11.11, Appellee's management need not fear waking up one morning to unexpectedly see the Sears site occupied by a warehouse. Section 11.11 provides specific requirements by which Appellant is to notify Appellee that the site "is to be used" for non-retail purposes. Appellant has consistently argued it never provided such notice, because doing so would have been premature, and disputes the trial court's finding that Appellant gave Appellee section 11.11 notice when Appellant "hand-delivered" redevelopment plans to Appellee and submitted redevelopment plans to the City. It would be difficult for Appellant to argue that Appellee failed to timely exercise its section 11.3 rights if Appellant has maintained that the notification to trigger section 11.3 was never provided.

Both parties agree that the phrase "is to be used" means an anticipatory future use. However, the parties disagree as to when that use occurs. Appellant *has not* argued the Sears site "is to be used" only once "demolished, redeveloped, and used for non-retail purposes," as the majority contends. This was Appellee's own characterization of Appellant's interpretation of "is to be used." Instead, Appellant has consistently maintained that, per the REA's section 11.3, the site "is to be used" for

7

non-retail purposes only *after gaining zoning approval* from the City of Boca Raton. On the other hand, Appellee argues the "is to be used" trigger was pulled once Appellant discussed/shared non-retail plans with Appellee and *sought zoning approval* for using the site for non-retail purposes.

The trial court summarized, "an exhaustive review of Florida jurisprudence provides limited instruction regarding this disputed contractual language." Thus, the trial court attempted to provide its own reasonable construction to the disputed phrase, in line with Appellee's construction, and summarily concluded: "As a matter of commonsense . . . 'is to be used'—refers to anticipatory use, rather than a prior or active use."

The trial court's minimal definition is correct, to the extent that the phrase refers to prospective use; however, it does not go far enough to answer the question at hand. If it is determined that the site "is to be used for non-retail purposes during the Term of the [REA]," that indicates a decision has been made that the site *will be* so used, barring unforeseen obstacles. The fact that preliminary steps have been taken does not lead to the same conclusion. Here, Appellant's "plans" were *exploratory* and perhaps *aspirational*—it was too early in the process to deem them *anticipatory*.

The fact that a university offers a scholarship to a high school athlete does not lead to the conclusion the athlete "is to be" playing for that university. The player must accept the offer and enroll at the school, be healthy enough to play, and then "earn" playing time. The NCAA and the university must find that the athlete is eligible to attend the university and also meets NCAA eligibility standards.

In the instant case, Appellant arguably wasn't even at the scholarship offer stage. Appellant was first working with Appellee to determine either a retail or non-retail use of the site and then going through the Boca Raton zoning process. As the city has rejected Appellant's proposal that included allegedly non-retail usage at the site, it would not be absurd to argue that the site is *not* to be used for non-retail purposes.

In reaching its summary judgment determination, the trial court determined that Appellant "began to solidify an intent to redevelop the Sears [s]ite" in its pre-application submission to the City of Boca Raton and the November 2018 email. The trial court observed that conduct which evolves from "conceptual discussion to telephone calls and emails to numerous applications and costly submissions, eventually connotes a

8

firmer commitment to pursue a redevelopment plan." The trial court held that Appellant's actions served Appellee "with direct knowledge of [Appellant's] intention to redevelop the Sears [s]ite for a non-retail purpose." In reaching this holding, the trial court weighed conflicting testimony and disregarded some of Appellant's testimony and evidence regarding its intent. However, "intent is a question of fact that should not be decided on a summary judgment." *Olsen v. First Team Ford, Ltd.*, 359 So. 3d 873, 878 (Fla. 5th DCA 2023) (quoting *Hodge v. Cichon*, 78 So. 3d 719, 723 (Fla. 5th DCA 2012)); *see also Webb v. Blancett*, 473 So. 2d 1376, 1378 (Fla. 5th DCA 1985) ("[I]t is up to the trier of fact to determine whether the words or conduct of a party demonstrates the requisite intent.").

## Conclusion

Based on the foregoing, I respectfully dissent. Pursuant to a "commonsense" interpretation of "is to be used," Appellee and the trial court erred in concluding that Appellant's sharing its plans and seeking zoning approval was notice of what it might do with the property, not notice of how the site "is to be used." At a minimum, disputed issues of fact and interpretation remain for a trier-of-fact to hear and resolve. Reversal or remand are more appropriate decisions than affirmance in this case.

*    *    *

***Not final until disposition of timely filed motion for rehearing.***